501 F.2d 1120
 Fed. Sec. L. Rep. P 94,763
SAFEWAY PORTLAND EMPLOYEES' FEDERAL CREDIT UNION, a Federal
Credit Union, Plaintiff-Appellee,
v.
C. H. WAGNER & CO., INC., a Massachusetts corporation, et
al., Defendants-Appellants.
 No. 72-1429.
 United States Court of Appeals, Ninth Circuit.
 Aug. 5, 1974.
 
 1
 William E. Hurley (argued), Bernard, Hurley, Hodges & Kneeland, Portland, Or., for defendants-appellants.
 
 
 2
 Edward L. Fitzgibbon (argued), Portland, Or., for plaintiff-appellee.
 
 
 3
 Walter P. North, Acting Gen. Counsel, Securities and Exchange Commission (argued), Washington, D.C., for amicus curiae.
 
 
 4
 Before DUNIWAY and SNEED, Circuit Judges, and BEEKS,* District judge.
 
 OPINION
 BEEKS, District Judge:
 
 5
 This appeal challenges the lower court's determination that defendants violated Title I, Sec. 5(a) of the Securities Act of 1933 ('Act'), 15 U.S.C. 77e(a), by using the mails to sell plaintiff unregistered securities.[1]
 
 
 6
 Safeway Portland Employees' Federal Credit Union ('Credit Union') is a federal credit union established pursuant to 12 U.S.C. 1751 et seq., to act for the benefit of Safeway employees in the State of Oregon.
 
 
 7
 C. H. Wagner & Company ('WagnerCo'), a Massachusetts corporation, is a securities broker/dealer registered in twenty-five states, including Oregon. One of the types of transactions in which it is engaged is the brokerage of certificates of deposit ('CDs'), which is accomplished in concert with one of its subsidiaries, Wagner Funding, another Massachusetts corporation. Wagner Funding obtains through independent money brokers, borrowers willing to pay a premium to induce third parties to purchase CDs issued by specified banks from which the borrowers seek loans.[2] WagnerCo locates investors to purchase the CDs by offering a bonus in the form of an additional rate of interest to be paid out of the premium received from the borrower.
 
 
 8
 Pursuant to an arrangement by Wagner Funding with a Houston money broker, WagnerCo sold to various investors approximately $4,000,000 of CDs, bearing interest at the rate of 7 1/2%, issued by Sharpstown State Bank ('Bank'), a Texas state bank insured by Federal Deposit Insurance Corporation ('FDIC'). Of these, Credit Union purchased two CDs totalling $250,000.00 which matured one year from date of issue, being induced so to do by WagnerCo's agreement to pay Credit Union additional interest at the rate of 5/8% On the date the CDs matured. Thus, the total return to Credit Union was 8 1/8%.[3]
 
 
 9
 On January 22, 1971, Bank was ordered closed, FDIC becoming the receiver.
 
 
 10
 Credit Union brought this action to recover the purchase price. Based upon the above related, undisputed facts, the district court entered partial summary judgment, finding that WagnerCo used the mail to sell unregistered securities. Judgment was entered against all named defendants for the purchase price, interest and costs.
 
 
 11
 The principal question here involved is whether the 'package', consisting of the CDs and the bonus, is a security within the meaning of the Act, it being undisputed the mails were used in the sale and no registration statement was filed.[4] Plaintiff contends the transaction involves an investment contract, i.e., a security within the meaning of the Act.[5] Defendants deny this, claiming the absence of a common enterprise because Credit Union was not led to expect profits as a result of any action by defendants, and that the obligation undertaken by Bank is severable from WagnerCo's promise to pay the bonus. Defendants further argue that even if the transaction is covered by the Act, the security was issued by a bank and hence exempt.[6]
 
 
 12
 In resolving the issues, we are mindful that the Act is remedial and is to be liberally construed.[7] We look to the character of the entire transaction, including the economic inducements held out to the investor.[8]
 
 
 13
 An investment contract is a scheme involving '. . . an investment of money in a common enterprise with profits to come (to the investor) solely from the efforts of others.'[9] 'A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'[10]
 
 
 14
 The district court was correct in concluding that the 'package' is a non-exempt investment contract. Credit Union was to receive 8 1/8% On its entire investment, without any further effort on its part. This return was dependent, at least in part, on the success of WagnerCo. Contrary to defendants' contention, Credit Union was led to expect profit as the result of WagnerCo's efforts in obtaining the issuance of the CDs and in completing the transaction whereby Credit Union would receive the bonus. Furthermore, the future payment of the bonus was dependent on the continued success and solvency of WagnerCo.
 
 
 15
 We likewise reject defendants' contention that the transaction consists of two distinct and severable parts and that their liability is only for the part relating to payment of the bonus. Even if it be assumed that the CDs are not securities or that they are exempt securities, as defined in the Act, and that WagnerCo's indebtedness to Credit Union is a security,[11] it does not follow that only the latter violated the Act. The combination of the two created an integrated investment package which must be viewed in its entirety in determining whether it is within or without the Act. This package differs fundamentally from the CDs issued by Bank in that there is a greater rate or return to Credit Union. WagnerCo's own ability to pay Credit Union, an investment risk foreign to that associated with the CDs, is also an inherent part of the package.
 
 
 16
 The nature of the economic inducment is of great significance.[12] Credit Union made one payment for the package, and, more importantly, there is no doubt but that the inducement for the purchase was the total combined rate of interest to be realized.
 
 
 17
 Furthermore, all elements of an investment contract do not have to be securities in order for the entire package to so qualify. The Tenth Circuit faced a similar problem wherein one defendant sold beavers, notifying the purchasers that the other named defendants would independently raise the beavers for a fee.[13] It was there held that the sale, by itself, did not require registration, but when the sale was only a part of a larger marketing concept wherein the purchaser expected rpofits, not from the resale of the beavers, but from the contracts pursuant to which the beavers were bred, raised and marketed, it was an 'investment contract'. So viewed, the elements of the Wagner package are inseparable.
 
 
 18
 Furthermore, since the package was not issued or guaranteed by a bank, defendants' claim of exemption must also fail.
 
 
 19
 The Securities and Exchange Commission (SEC), The Comptroller of the Currency (Comptroller) and FDIC have filed amicus curiae briefs herein. All were of assistance to the court and the court expresses its appreciation. SEC takes the position that a CD is an exempt security under the Act. Comptroller and FDIC contend that a CD is not subject to the Act, exempt or otherwise. All three agencies agree, however, that the package involved herein, which includes the CDs, is subject to the Act. In view of our conclusion that the package is a non-exempt security, we need not, and do not decide the status of CDs under the Act.
 
 
 20
 Defendants Ann Louise Wagner, Ann C. Wagner and Doherty further claim that the record does not support individual judgment against them. Ann Louise Wagner is correct. The other two are wrong. As to them, the record fully supports the judgment. WagnerCo's three officers, C. H. Wagner, President; Ann C. Wagner, Secretary-Clerk; and Doherty comprised its entire board of directors. In addition, Ann C. Wagner with her husband, C. H. Wagner, owned 94 percent of its stock.
 
 
 21
 The Act imposes liability on persons[14] who make use of the mails to sell an unregistered security,[15] and also on those who control them.[16] Both Ann C. Wagner and Doherty were controlling persons.[17]
 
 
 22
 The Act exempts controlling persons who '. . . had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist'.[18] Those claiming the exemption have the burden of proving it.[19] Neither offered any proof and they were not justified in resting on the mere denials of their pleadings.[20]
 
 
 23
 Defendants' remaining contentions assert that certain factual findings are not supported by the evidence. Assuming this to be so, the error is harmless, there being sufficient undisputed evidence to support our determination.
 
 
 24
 As to defendant Ann Louise Wagner, the judgment is reversed and remanded for further proceedings. As to the remaining defendants, the judgment is affirmed.
 
 
 25
 SNEED, Circuit Judge (concurring in the result):
 
 
 26
 While I concur in the result reached by my brothers, I do think it necessary to draw attention to what appears to me to be a regulatory anomaly resulting from this decision. The primary abuse that flows from brokered funds is the encouragement it provides to banks to make unsafe loans. This is essentially a banking problem and thus a primary responsibility of the Comptroller of the Currency and the Federal Deposit Insurance Corporation. Nonetheless, this decision subjects the practice to a degree to regulation by the Securities and Exchange Commission. My concern with this anomaly is moderated by the fact that all three agencies are prepared to accept the proposition that, at least under come circumstances, brokered deposits may be investment contracts within the meaning of the Securities Act.
 
 
 27
 At this point I should not like to be understood as embracing the view that in all events a brokered deposit is an investment contract. In this case I am prepared to accept the conclusion that representations and activities of the broker are sufficiently similar to the breeding and marketing of beavers in Continental Marketing, Inc. v. S.E.C., 387 F.2d 466 (10th Cir., 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968) to make that case persuasive authority. The mere statement of this proposition demonstrates that our decision in this case approaches the outer limits of the reach of Continental Marketing. I have grave doubts, for example, that the 5/8% Bonus offered by Wagner alone is sufficient to transform the entire package into a nonexempt investment contract. Nor am I prepared at this time to acknowledge that such an increased return is in all cases conclusive evidence of the type of activities which in this case brings the entire package within the doctrine of Continental Marketing.
 
 
 28
 Finally, it must be remembered that in Continental Marketing the court emphasized that under the facts before it the investor was investing in a common enterprise to establish a domestic beaver industry the returns from which were uncertain. This justified the 'investment contract' designation. A certificate of deposit even when accompanied by a bonus under some circumstances may not constitute such an investment. The passivity of all but the issuing bank and its borrower may reach a level that requires the rejection of the 'investment contract' characterization.
 
 
 29
 With these reservations, I concur in the result.
 
 
 
 *
 The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 15 U.S.C. 77e(a) 'Unless a registration statement is in effect as to a security, it shall be unlawful . . . to make use of . . . the mails to sell such security . . ..'
 
 
 [2]
 The practice has economic importance during periods of 'tight money' when banks are unable or unwilling to make loans without requiring compensating balances. In such cases the borrower may seek the services of a money broker
 
 
 [3]
 In most instances the bonus is paid by WagnerCo at the time of purchase, but Credit Union feared this might violate one of its governing regulations. WagnerCo, therefore, agreed to pay at maturity and acknowledged the obligation in writing
 
 
 [4]
 See generally, Lennerth v. Mendenhall, 234 F.Supp. 59, 63 (N.D.Ohio, 1964)
 
 
 [5]
 15 U.S.C. 77b(1) 'The term 'security' means any . . . investment contract . . ..'
 
 
 [6]
 15 U.S.C. 77c(a) '. . . The provisions . . . shall not apply to . . . (2) . . . any security issued or guaranteed by any bank . . ..'
 
 
 [7]
 S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 480-481 (9th Cir., 1973), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); El Khadem v. Equity Securities Corp., 494 F.2d 1224, 1227 (9th Cir., 1974)
 
 
 [8]
 See generally, S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352-353, 64 S.Ct. 120, 88 L.Ed. 88 (1943)
 
 
 [9]
 S.E.C. v. W. J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)
 
 
 [10]
 S.E.C. v. Glenn W. Turner Enterprises, Inc., supra note 7, 474 F.2d at 482
 
 
 [11]
 15 U.S.C. 77b(1): 'The term 'security' means any . . . evidence of indebtedness . . ..' See generally, Llanos v. United States, 206 F.2d 852 (9th Cir., 1953), cert. denied 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417 (1954)
 
 
 [12]
 S.E.C. v. C. M. Joiner Leasing Corp., supra note 8, 320 U.S. at 353, 64 S.Ct. 120, 88 L.Ed. 88; S.E.C. v. W. J. Howey Co., supra note 9, 328 U.S. at 299-300, 66 S.Ct. 1100, 90 L.Ed. 1244; Los Angeles Trust Deed & Mortgage Exchange v. S.E.C., 285 F.2d 162, 172 (9th Cir., 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961)
 
 
 [13]
 Continental Marketing Corp. v. S.E.C., 387 F.2d 466 (10th Cir., 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968)
 
 
 [14]
 15 U.S.C. 77b(2): 'The term 'person' means an individual, a corporation . . ..'
 
 
 [15]
 15 U.S.C. 77l: 'Any person who-- (1) offers or sells a security in violation of 77e of this title . . . shall be liable to the person purchasing such security from him . . ..'
 
 
 [16]
 15 U.S.C. 77o: 'Every person who, by or through stock ownership, agency or otherwise . . . controls any person liable under Sections . . . 77l of this title, shall also be liable . . ..'
 
 
 [17]
 17 C.F.R. 230.405(f), as quoted in Pennaluna & Co. v. S.E.C., 410 F.2d 861, 864 (9th Cir., 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970): 'The term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.'
 
 
 [18]
 15 U.S.C. 77o
 
 
 [19]
 Pennaluna & Co. v. S.E.C., supra note 17, at 865
 
 
 [20]
 Fed.R.Civ.P. 56(e)