**Samuel WEAVER and Alice Weaver, Appellants,**

v.

**MARINE BANK.**

**No. 80–1274.**

United States Court of Appeals, Third Circuit.

Argued Sept. 18, 1980.

Decided Dec. 15, 1980.

Rehearing Denied Jan. 26, 1981.

As Amended Jan. 28, 1981.

---

Andrew J. Conner, Dunn & Conner, Inc., Erie, Pa., for appellants.

Christine Hall McClure, Daniel L. R. Miller, McClure, Dart, Miller, Kelleher & White, Erie, Pa., for appellee.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

Samuel and Alice Weaver appeal from an order granting summary judgment in favor

of Marine Bank (Bank) on their complaint seeking equitable relief against or damages from the Bank. The complaint asserts federal question jurisdiction, alleging that the Bank violated section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 891, 15 U.S.C. § 78j(b).[1] It also pleads pendent claims for violation of the Pennsylvania Securities Act, Pa.Stat.Ann. tit. 70, § 1–101 et seq. (Purdon Supp. 1980), and for common law fraud. The district court granted summary judgment on the federal law claim and declined to exercise pendent jurisdiction over the state law claims. We reverse.

## I.

### Facts and Proceedings in the District Court

Many of the facts are undisputed. Marine Bank, beginning sometime in 1976, made three loans to Columbus Packing Company, an unincorporated business owned by Raymond J. and Barbara J. Piccirillo. Columbus Packing operated a wholesale slaughterhouse and a retail meat market in Corry, Pennsylvania. The loans were secured by perfected security interests in equipment, inventory and accounts receivable, liens on several motor vehicles, and second mortgages on two pieces of real estate. Early in 1978 Robert Santom, newly appointed manager of the Corry branch of Marine Bank, designated the Columbus Packing loans as concerned loans because he did not believe the proprietorship had adequate cash flow and because there was no set repayment program. Besides the outstanding loans, Columbus Packing also had a substantial overdraft position with the Bank. Santom told Mr. Piccirillo that the bank would take possession of its collateral and sell it unless Piccirillo either found a buyer, sold his business and paid the bank, closed the business and sold its assets to pay the bank, or secured additional capital.

On March 17, 1978, a new loan agreement was executed, whereby the Bank loaned Columbus Packing $65,000 on a demand note signed by the Piccirillos, secured as before, by security agreements covering equipment, inventory and accounts receivable, liens on motor vehicles, and liens on the same two pieces of real estate. Simultaneously Mr. and Mrs. Weaver, who were farmers engaged in auctioning livestock, signed an agreement of guaranty which guaranteed payment of the Piccirillos' debt to a maximum of $50,000. To secure this guaranty, the Weavers pledged to the bank a $50,000 certificate of deposit issued by the Marine Bank to them, payable in six years, and bearing interest at six percent. To purchase this certificate of deposit from Marine Bank's Corry branch, the Weavers withdrew $50,000 from another bank. Aged 79 and 71 respectively, they had no formal education beyond the eighth grade, and had spent their lives as cattle farmers.

Prior to the closing on the loan, guaranty, and pledge, the Piccirillos and the Weavers entered into a written agreement providing that the Weavers were to receive fifty percent of the "adjusted net profits" of Columbus Packing and the sum of $100 a month.

The proceeds of the $65,000 loan were forthwith disbursed to repay loans and overdraft obligations to the Bank approximating $42,800, to pay past due federal taxes, and to pay past due obligations to trade creditors. That left approximately $3800 for working capital. Four months later, Columbus Packing filed a bankruptcy petition. The Bank's security in property of Columbus Packing or of the Piccirillos is inadequate, and it intends to resort, for the deficiency, to the pledged certificate of deposit.

Turning to the disputed facts, the Bank contends that prior to the closing on the loan and guaranty it disclosed to the Weavers all the Columbus Packing debts of which it had knowledge, that at that time it believed its loans were fully collateralized by the Columbus Packing and Piccirillo properties, and that it had no knowledge whatsoever of the agreement between the

---

1. In a motion for leave to file an amended complaint the Weavers also alleged that the Bank's conduct violated § 17(a) of the Securities Act of 1933, 48 Stat. 84, 15 U.S.C. § 77q(a).

Piccirillos and the Weavers. From the pleadings, affidavits, and depositions on file, however, a fact finder could find that at a time the Bank was aware of Columbus Packing's desperate financial condition, and doubtful about the adequacy of its collateral position, employees of the Bank approached the Weavers and urged them to make an investment in Columbus Packing for the purpose of providing working capital. The Weavers then had no knowledge of or interest in investing in a slaughterhouse business. Further, it could be found that the Weavers initially declined Marine Bank's suggestion that they make such an investment, but were persuaded to pledge their certificate of deposit in exchange for a $65,000 loan to Columbus Packing on the representation that substantially all of the loan would be available to that business for working capital, and on the representation that the existing collateral adequately protected both their interest and the Bank's.

The district court did not conclude that the conduct of the Bank's agents which a fact finder might find, if it occurred "in connection with" the sale or purchase of a security, would not be a violation of Rule 10(b)(5). The court appears to have assumed, without deciding, that liability might be predicated upon a conclusion that as an insider, having access to information not available to the public, the Bank had a duty to disclose material adverse information, or that even if the Bank were not treated as an insider it might be found to be an aider and abettor in a fraud committed by the Piccirillos. *See, e. g., SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848

(2d Cir. 1968), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971) (an insider is one who has access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the benefit of anyone); *Monsen v. Consolidated Dressed Beef,* 579 F.2d 793, 799 (3d Cir.), *cert. denied sub nom. First Pennsylvania Bank N.A. v. Monsen,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978) (plaintiffs have the burden of establishing that there has been a wrongful act, and that the alleged aider and abettor knew of and substantially assisted in the wrongdoing); *Landy v. FDIC,* 486 F.2d 139, 162–63 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) (an aider and abettor is liable if an independent wrong exists, he knew of the wrong, and substantial assistance was given in effecting it). Rather, the court concluded that if a wrong occurred, on the undisputed facts as a matter of law it did not take place "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b).

The Weavers urge that a fact finder could hold that the Bank's manipulative and deceptive conduct fell within the proscription in section 10(b) because it was in connection with the purchase of a security from the Piccirillos, and also in connection with the sale of a security to the Bank. If they are right on either contention, summary judgment should not have been granted in favor of the defendant. We address those questions separately, starting with the definition of security in the Securities and Exchange Act of 1934 quoted in the margin.[2]

---

**2.** Section 3(a)(10) provides in pertinent part:
(a) When used in this chapter, unless the context otherwise requires—

 . . . .

(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation

in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity is likewise limited.
15 U.S.C. § 78c(a)(10). As is here relevant, the definition of security is essentially the same as in § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1). In any event, the definitions have been considered to be virtually identical. *See, e. g., United Housing Foundation, Inc. v. For-*

## II.

### The Piccirillo Transaction

A fact finder certainly could on the record before us find that the Bank's manipulative and deceptive conduct, if it took place, was in connection with the execution and delivery of an agreement between the Piccirillos and the Weavers by which, in consideration of their pledge of a $50,000 certificate of deposit to enable Columbus Packing to obtain a working capital loan, they were given a fifty percent interest in the anticipated profits of the Piccirillos' slaughterhouse. Nor is there any question but that the transaction between the Piccirillos and the Weavers would qualify as a sale. The narrower question is whether whatever interest was sold by the Piccirillos falls within one of the categories of securities set forth in section 3(a)(10). It is a settled rule of construction of that definitional section that the categories are not mutually exclusive. "Instruments may be included within any of [the Act's] definitions, as a matter of law, if on their face they answer to the name or description." *Tcherepnin v. Knight*, 389 U.S. 332, 339, 88 S.Ct. 548, 555, 19 L.Ed.2d 564 (1967), *quoting SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 124–125, 88 L.Ed. 88 (1943). More specifically, an interest can be both a certificate of interest or participation in any profit-sharing agreement, and an investment contract. *Tcherepnin v. Knight*, 389 U.S. at 339, 88 S.Ct. at 555. We hold that the agreement whereby the Piccirillos and the Weavers each would receive fifty percent of the profits of Columbus Packing could be found by a trier of fact to be either or both.

The classic example of a certificate of interest or participation in a profit-sharing arrangement cited by Professor Loss is a contract whereby the buyer furnishes funds and the seller the skill for speculating in the stock or commodities markets under an arrangement to split any profits. 1 Loss, Securities Regulation 489 (2d ed. 1961). Aside from the brief reference to it in *Tcherepnin*, this clause has not often been considered by the Supreme Court. *Cf. International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558 n.11, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979). There are, however, ample applications elsewhere of that clause to arrangements which are quite closely analogous to that before us. *See, e. g., SEC v. Addison*, 194 F.Supp. 709, 721–22 (N.D.Tex.1961) (written agreements in connection with loans to the effect that defendants would cause contracts to be executed conveying to lenders a percentage interest in profits from defendants' mining operations); *William Tell Productions, Inc.*, Sec. Act Rel. 3852 (1957), 3–4 (fractional interest in a percentage of gross revenues to be realized from an exclusive production of a copyrighted television production). No reason occurs to us why a sale of an interest in the future profits of a slaughterhouse ought to be treated differently. In the cited interest or participation in a profit-sharing agreement cases the interest was offered to more persons than a husband and wife. The nature and size of the offering, however, bears only on whether the interest sold is exempt from registration under the Securities Act of 1933, not on whether the interest is a security. Section 10(b) of the 1934 Act covers both registered and unregistered securities. The Columbus Packing interest is evidenced by a writing calling for a participation in its future profits derived as a result of the Piccirillos' management of the slaughterhouse. A jury could find that it was a certificate of interest or a participation in a profit-sharing agreement.[3]

In contrast with the profit-sharing agreement clause, the investment contract clause has received a fairly extensive exegesis in the Supreme Court. In the leading case of

---

man, 421 U.S. 837, 847 n.12, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967).

**3.** We speak in terms of what a jury could find since we review a grant of summary judgment. We do not imply that absent some issue of fact raised by the defendant the issue should not be decided as a matter of law.

*SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), contracts for the sale of units of land in a citrus grove development, coupled with contracts with the promoter for cultivating, harvesting, and marketing the crop were found to be investment contracts. The crop from the entire grove was to be sold, and the net proceeds distributed to the separate land owner in the proportion that the land of each produced the crop. If there is a difference between a profit-sharing agreement and an investment contract, probably it is in the fact that the latter includes transactions such as that in *Howey*, in which the purchaser did not share the profits on his investment with others, but kept the net proceeds himself. The court capsulized the test for distinguishing an investment contract from a mere commercial or consumer transaction as "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104. In subsequent cases the Court has adhered to this test,[4] although recently the justices have differed as to its application to a specific set of facts. In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 62 (1975), a majority of the Court held that an investment in a cooperative housing project was not a security. Justice Powell, writing for the Court, quoted the *Howey* test and further stated:

> The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in *Joiner, supra* (sale of oil leases conditioned on promoters' agreement to drill exploratory well),

or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits). In such cases the investor is "attracted solely by the prospects of a return" on his investment. *Howey, supra,* [328 U.S.] at 300 [66 S.Ct. at 1103–1104]. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased—"to occupy the land or to develop it themselves," as the *Howey* Court put it, *ibid.* —the securities laws do not apply.

421 U.S. at 852–53, 95 S.Ct. at 2060–2061 (footnote omitted). Here there is no evidence whatsoever in the record that the Weavers wanted to use or develop the Columbus Packing slaughterhouse themselves. It does not appear that they were issuing their obligations to purchase a business they intended to manage.[5] A fact finder could determine that the Weavers made a $50,000 investment motivated primarily by a desire to earn fifty percent of the profits earned by the use of those funds as working capital in a business run by the Piccirillos.

In rejecting the foregoing analysis the dissenting opinion relies on the fact that the Weavers were to obtain use of the Piccirillos' barn and pasture. If a fact finder were to determine that use of the barn and pasture was a primary rather than an incidental purpose of the transaction, it might well decide in favor of Marine Bank. But unlike the dissent we decline to hold that this record compelled that determination as a matter of law.

 Since a fact finder could have found that the Bank engaged in manipulative or deceptive acts or practices in connection with the purchase by the Weavers of a contract for a fifty percent share in the profits of Columbus Packing, and could

**4.** *See Tcherepnin v. Knight*, 389 U.S. 338, 88 S.Ct. 554 (withdrawable capital shares in savings and loan association are investment contracts); *International Brotherhood of Teamsters v. Daniel*, 439 U.S. at 558, 99 S.Ct. at 795–796 (1979) (noncontributory, compulsory pension plan is not an investment contract). The *Howey* rule was anticipated in *SEC v. C.M.*

*Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

**5.** *Cf. Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973) (purchase of franchise accompanied with significant efforts on part of purchaser was not an investment contract).

have found that that contract was a certificate of interest or participation in a profit-sharing agreement, or an investment contract, or both, the entry of summary judgment against the Weavers was improper. That conclusion requires a reversal. Because we are remanding for trial it is also appropriate to address the additional question whether the pledge of a certificate of deposit was a sale of a security.

## III.

### The Certificate of Deposit

■ Certainly if the manipulative and deceptive acts or practices alleged by the Weavers actually occurred, it was in connection with the pledge of the certificate of deposit. Thus those acts or practices are actionable under section 10(b) unless the pledge arrangement was not a sale, or the certificate of deposit is not a security.

Under the 1934 Act the term purchase includes any contract to buy, purchase, or otherwise dispose of, and the term sale includes any contract to sell or otherwise dispose of. 15 U.S.C. § 78c(a)(13), (14). On March 17, 1978, the Weavers executed an assignment reading in part:

> For value received and intending to be legally bound, the undersigned does hereby sell, assign, transfer and set over unto Marine National Bank (hereinafter called "Bank") all the undersigned's right, title and interest in and to a certain deposit account in the undersigned's name in bank described as follows:
>
> Marine Bank Certificate of Deposit # 38240 $50,000.00 due February 1984 together with all monies due and to become due thereon, both principal and in-

terest, as security for the payment of a loan in the amount of $50,000.00....

. . . . .

> Payment in full of said note shall render this assignment void; otherwise the same shall be and remain in full force and effect.

We have little doubt that if the Weavers had delivered a forged instrument the Bank would contend vigorously that it had made a purchase within the meaning of the 1934 Act, and that the Weavers ought to be prosecuted by the federal government. There is no reason for treating the Weavers' pledge of a valid instrument differently. Thus we agree with those cases in the Second Circuit which have consistently held that a pledge is a sale. *Mallis v. Federal Deposit Ins. Corp.*, 568 F.2d 824, 829–30 (2d Cir. 1977), *cert. dismissed sub nom. Banker's Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (pledge is a contract to sell or otherwise dispose of); *United States v. Gentile*, 530 F.2d 461, 466–67 (2d Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976) (pledge is a sale). *See also Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1028–30 (6th Cir. 1979). There are contrary expressions in other courts.[6] We do not find them persuasive, if for no other reason than that there is no reason to presume that Congress intended to exclude lending institutions extending credit on the security of pledged collateral from the protection of section 10(b). If a pledge is a purchase for the purpose of protecting a lender it is equally a sale for purposes of protecting the pledgor. Moreover, most of the courts which have intimated that the pledge transaction is not a sale have conceded that its foreclo-

---

**6.** *See, e. g., Lincoln Nat'l Bank v. Herber*, 604 F.2d 1038, 1044 (7th Cir. 1979); *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1299–30 (5th Cir. 1978); *Reid v. Hughes*, 578 F.2d 634, 638 (5th Cir. 1978); *McClure v. First Nat'l Bank of Lubbock, Texas*, 497 F.2d 490, 495–96 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Rispo v. Spring Lake Mews, Inc.*, 485 F.Supp. 462, 467–68 (E.D.Pa. 1980).

As the dissent correctly notes, the Supreme Court has granted certiorari on the question of whether a pledge of stock to a bank as collateral for a bank loan is an offer of sale for a security under § 17(a) of the Securities Act of 1933. *Rubin v. United States*, 445 U.S. 960, 100 S.Ct. 1645, 64 L.Ed.2d 234 (1980), *granting cert. to United States v. Rubin*, 609 F.2d 51 (2d Cir. 1979).

sure is.[7] In this case since the Bank is the issuer of the certificate of deposit, foreclosure, if it is permitted, will take the form of a mere refusal to honor the certificate of deposit, and the setting off of the liability against the Columbus Packing debts. We conclude that on this record a fact finder could hold that a sale of the Weavers' certificate of deposit occurred.

That leaves the question whether the certificate of deposit was itself a security. We note at the outset that it was issued by Marine Bank. That fact is significant only for purposes of section 3(a)(2) of the Securities Act of 1933, which exempts from its registration requirements securities issued by banks whose issues are regulated by federal or state banking officials. 15 U.S.C. § 77c(a)(2). However, bank securities are not exempt from the antifraud provisions of the 1934 Act. *See* 2 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud, § 6.5(312), at 136.1 (1979).

We can in this case also exclude the exception in the 1934 Act's definition of security for "currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months...." 15 U.S.C. § 78c(a)(10). The certificate of deposit pledged by the Weavers was certainly not currency. Furthermore, since the issuing bank had no obligation to pay for six years, it did not qualify for the nine month commercial paper exception.

In *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), referred to above in our discussion of investment contracts and profit sharing agreements, the Supreme Court held that withdrawable capital shares in a savings and loan association were securities. From an investor's standpoint those shares were the functional equivalents of certificates of deposit, ex-

cept, perhaps, for the fact that the savings and loan in *Tcherepnin* was a mutual institution in which the depositors had an interest in profits. Here, Marine Bank's obligation is to pay a sum certain and a fixed interest return. It is in form and in fact a long term debt obligation. Although, technically, *Tcherepnin* is not controlling, functionally, from the depositor's standpoint, it is hard to distinguish long term deposit transactions with mutual institutions from similar deposit transactions with banks operated for the profit of stockholders. Moreover, when the Court wrote *Tcherepnin* it must have been aware that the Administrator of National Banks in a Statement of Policy on Advertising for Funds by National Banks, 31 Fed.Reg. 16581 (1966), endorsed the SEC's view that deposit and share accounts of banks are subject to the antifraud provisions of the securities laws. *See* 1 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud, # 4.6(374), at 82.15. Finally, we note that the Securities and Exchange Commission has taken the position that certificates of deposit issued by banks are securities.[8]

■ Since there is no general antifraud exception for bank securities, and since when Marine Bank borrowed for more than nine months it issued what in all material respects is the functional equivalent of any other corporation's bond or note, we cannot on this record hold that a certificate of deposit evidencing its debt is not, like other long term bonds or notes, a security.[9] Perhaps at trial some distinguishing features may be developed. But certainly on the record before us it was error to grant summary judgment against the Weavers on the ground that the manipulative acts and practices of which they complain were not made in connection with the purchase or sale of a security. As did the court in *Bellah v. First*

7. *See, e. g., Lincoln Nat'l Bank v. Herber, supra; McClure v. First Nat'l Bank of Lubbock, Texas, supra.*

8. *See MacKethan v. Peat, Marwick, Mitchell & Co.,* 439 F.Supp. 1090, 1094 (E.D.Va.1977), referring to the amicus curiae brief of the Securities & Exchange Commission filed in *Burrus,*

*Cootes & Burrus v. MacKethan,* 537 F.2d 1262 (4th Cir. 1976).

9. We do not rely on the language "certificate of deposit, for a security" in section 3(a)(1). That language refers to a type of security irrelevant to the issues in this case.

*National Bank of Hereford, Texas,* 495 F.2d 1109, 1116 (5th Cir. 1974), we remand "so as not [to] foreclose them from an opportunity to pursue that theory of liability in the district court...."

## IV.

### *Other Considerations*

■ A few words are appropriate with respect to the district court's approach to the proper interpretation of the Securities Act of 1934. Throughout the court's opinion granting summary judgment there is a general tone of nostalgia for the days when victims of fraud were relegated to the common law remedy of deceit, and when such actions were tried in state courts under state law standards. This interpretation of the Act is grudging of coverage and is fundamentally at variance with the decision made by Congress in 1934 to place a *national* floor under the level of conduct to which parties dealing in the national investment market might descend. The 1934 Act defines securities so broadly as to include virtually every transaction in which an investor might expect to receive a return on his money. It proscribes misconduct not in terms merely of common law fraud subject to all the vagaries of state law, but in the all-inclusive terms "manipulative acts and practices in connection with a purchase or sale" of a security. Most significantly, it provides in section 27 of the Act, 15 U.S.C. § 78aa, one of those comparatively rare instances in which federal jurisdiction is made exclusive. The message is clear that the federal courts have been given a very special responsibility for overseeing the level of permissible conduct in securities transactions. The reason for the congressional decision is equally clear considering the doleful pre 1934 history of securities transactions during which Congress, dependent upon state common law remedies for regulation of the level of conduct in securities transactions, watched standards of fiduciary duty and of representations in the mar-

ket place descend to the level tolerated in the most tolerant jurisdiction.[10] Given the special responsibility entrusted to them, the federal courts ought to interpret the 1934 Act with a presumption of coverage of any transaction which Congress did not expressly exclude. This is especially so when it is remembered that the state courts cannot enforce section 10(b), and thus that the Supreme Court will lack appellate jurisdiction to consider, when a trial is finally concluded in a state court, whether the underlying transaction offended national policy. 28 U.S.C. § 1257.

■ The federal exclusivity of the section 10(b) remedy is, moreover, a compelling reason why pendent state law claims ought to be heard in the federal court as well, even in states where state law would afford as much or more relief. *See, Cotler v. Inter-County Orthopaedic Association, P.A.,* 526 F.2d 537 (3d Cir. 1975). Thus we must also reverse the district court's dismissal of the pendent state law claims, so that the trial court may reconsider whether their trial should be held in the same tribunal which must consider the section 10(b) claim.

## V.

### *Conclusion*

The order appealed from, granting summary judgment on the Weavers' section 10(b) claim, and dismissing their pendent state law claims will be reversed, and the case remanded for further proceedings.

WEIS, Circuit Judge, dissenting.

It should come as no surprise that the panel is divided on the issues in this case because what constitutes a security under the 1933 and 1934 Acts is a matter which continues to trouble courts and commentators. There is no disagreement here about the facts or the inferences that can be drawn from them, except as they shed light on the preliminary clause of the definitions in § 3(a)(10) of the Security Exchange Act:

---

**10.** *See* A. A. Berle and G. C. Means. The Modern Corporation and Private Property (1932).

"unless the context otherwise requires." 15 U.S.C. § 78c(a)(10) (1976).

## I.

### THE PICCIRILLO TRANSACTION

The majority concludes that the interest sold by Piccirillo falls within one of the categories of security set forth in § 3(a)(10), but I am unable to accept that proposition based upon the facts of this case. The agreement here provided that in consideration for agreeing to act as co-obligor on Piccirillo's loan from the bank, Weaver would have the right, as long as Piccirillo was operating and in possession of the Columbus Packing premises:

1. To use the barn and pasture on the packing house premises at the discretion of Piccirillo;

2. To receive 50% of the "adjusted net profits" of the Columbus Packing Company so long as Weaver remained a co-obligor;

3. To receive $100 per month until the bank loan was repaid.

Piccirillo also agreed not to borrow additional money without prior consultation and approval by Weaver.

Certain preliminary observations are in order. The agreement obviously is not in a standard form that could be issued to the public at large. It was tailored to the unique circumstances of the parties, i. e., use of the barn and pasture, as well as Weaver's personal approval of further borrowings. There was no public offering by Piccirillo, but rather a purely private arrangement among individuals—Piccirillo, Weaver, and their spouses—involving no public market or exchange.

Even if the written agreement between the parties could be characterized as a "certificate of interest" or a profit sharing arrangement, it does not follow that the Securities Exchange Act applies. In an analagous situation we held that the statutory definition of a security embracing "every note" cannot be read literally and in context, a "note" may be without the statute. *Lino v. City Investing Co.*, 487 F.2d 689 (3d

Cir. 1973). Similar reasoning requires that the Piccirillo agreement be examined in context to determine if the transaction, however labeled, is within the scope of the Act.

In construing the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (1976), the Supreme Court noted that "courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350–51, 64 S.Ct. 120, 123–124, 88 L.Ed. 88 (1943) (footnote omitted).

Some years later, the Court emphasized that the focus of the Act is on the sale of securities to raise money for profitmaking purposes, on the exchanges on which securities are traded, and on the need for regulation to prevent fraud and protect investors. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). Thus, while the statutes are to be construed liberally, application is to turn on the economic realities underlying a particular transaction. *Id.* at 851–52, 95 S.Ct. at 2060. And as we cautioned in *Lino* "not every plan generating allegations of fraud is a violation of federal securities law." 487 F.2d at 695.

The majority believes that the Piccirillo agreement comes within the Exchange Act designation of an investment contract. In *United Housing Foundation, Inc. v. Forman*, the Court reaffirmed the explanation of the type of security that it had discussed in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). Describing its formulation as a "shorthand form . . . [of] the essential attributes," the Court defined an investment contract as "an investment of money in a common enterprise with profits to come solely from the efforts of others." 421 U.S. at 852, 95 S.Ct. at 2061. Application of that definition to the circumstances present here raises two issues: first, whether a "common enterprise" existed when only two parties

were involved in the transaction;[1] and secondly, were the "profits" to come solely from the "efforts of others" when part of the consideration recited was Weaver's right to use Piccirillo's barn and pasture.

Although a security was found to exist in *Howey*, several significant facts in that case contrast starkly with the circumstances at hand. In *Howey*, there was a public offering, an advertising program, sales to persons who were not residents of the state, and, during a 28 month period, purchases by 42 persons. Similarly, in *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), where the Court found capital shares in a savings and loan association to be an investment contract within the Securities Exchange Act, the plaintiff class consisted of more than 5,000 investors.

When the number of participants was much smaller, a different result has been reached. The Court of Appeals for the Seventh Circuit in *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 100 (7th Cir. 1977), concluded that the requirement of a common enterprise includes both multiple investors and a pooling of their funds. In that case, an arrangement through which individual investors deposited funds with a commodity broker in separate discretionary accounts for investment in a profit sharing arrangement was held to be neither an investment contract nor a profit sharing plan within the Securities Act. *Wasnowic v. Chicago Board of Trade*, 352 F.Supp. 1066 (M.D.Pa.1972), *aff'd mem.*, 491 F.2d 752 (3d Cir.), *cert. denied*, 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974). *Cf. SEC v.*

*Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974) (multiple investors but no pooling).

The rationale employed by the Seventh Circuit in requiring multiple investors to satisfy the commonality requirement is persuasive, and I would follow *Hirk* for that reason alone. But even more compelling is that the result is in keeping with the general purpose of the Securities Exchange Act—to regulate the securities markets where the public trades, and to scrutinize the various arrangements which are offered to the public as investments. *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 837, 95 S.Ct. at 2053. In the case at bar, no widespread public interest is affected.[2] The transaction was a face to face encounter involving two parties who made a loan agreement. *See Great Western Bank and Trust Co. v. Kotz*, 532 F.2d 1252, 1262 (9th Cir. 1976) (Wright, J., concurring). Here there is no distribution of a widely offered instrument commercially known as a security, as is the case with the various schemes involving transactions regulated by the Act. *See, e. g., SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. at 352–53, 64 S.Ct. at 124; *Hirk v. Agri-Research Council, Inc.*, *supra* at 103; *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974). In addition, there is no suggestion that the laws of Pennsylvania do not provide for an appropriate resolution of the dispute in this case. Indeed, as the majority notes, the plaintiff included pendent state claims in his complaint.[3]

---

1. In Pennsylvania, property owned by husband and wife is considered to be held as a tenancy by the entireties and the interest of husband and wife considered as one. *In re Holmes Estate*, 414 Pa. 403, 406, 200 A.2d 745 (1964). Hence, both Piccirillos owned the business as tenants by the entireties and the guaranty by the obligors was an entireties obligation.

2. *See* FitzGibbon, What is a Security? A Redefinition Based on Eligibility to Participate in the Financial Markets, 64 Minn.L.Rev. 893 (1980).

3. The Pennsylvania Securities Act provides:
 "It is unlawful for any person in connection with the offer, sale or purchase of any security ... (a) to employ any device, scheme or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."
 Pa.Stat.Ann. tit. 70, § 1–401 (Purdon Supp. 1980).
 The Pennsylvania definition of a "security", 70 Pa.Stat.Ann. tit. 70, § 1–102, is broader than that in the federal acts and is not preceded by the phrase "unless the context otherwise requires."

The second issue, whether the profits were to come from the sole or essentially management efforts of others, *see SEC v. Glenn W. Turner Enterprises,* 474 F.2d 477 (9th Cir. 1973), is not per se as important a factor in this case. Were that issue standing alone, I would be inclined to follow the philosophy of the court in *Safeway Portland Employees Federal Credit Union v. C. H. Wagner & Co.,* 501 F.2d 1120 (9th Cir. 1974), and apply the "package" concept to the various benefits that Weaver was to receive. There, the court held that the sale of interest bearing certificates of deposit, combined with a bonus agreement to pay additional interest on the transaction, was an investment package that qualified as a security. *Id.* at 1122.

If the other circumstances of the case at hand were not involved, the 50% share of the profits would carry the day on a similar basis. But more weight being given to Weaver's right to Piccirillo's barn and pasture is warranted when the arrangement is viewed in toto. Obviously, that benefit was of more value to Weaver than it would be to an out of state resident or to a person who had no connection with cattle raising. It is more in the nature of a "personal use" accomodation, shaped to fit the particular needs of the private parties involved. Thus, the arrangement between Weaver and Piccirillo does not have an equivalent money value to all persons, another characteristic generally attributable to true securities. *See United Housing Foundation, Inc. v. Forman,* 421 U.S. at 851, 95 S.Ct. at 2060. Moreover, when this factor is added to the lack of such features as common enterprise, use of a public market, public offering, and need for federal regulation, the conclusion is inescapable that the transaction between Weaver and Piccirillo does not qualify as a security within the meaning of the Securities Exchange Act.

## II.

### THE CERTIFICATE OF DEPOSIT

Section 3(a)(10) of the 1934 Act includes among its definitions of security, "certificate of deposit, for a security." The majority is correct in not relying on this language as a basis for its finding that the certificate of deposit under scrutiny here falls within that clause. The certificate in this case is an entirely different obligation, being a type of time deposit with a bank, rather than a receipt for a security as that term is used in the statute.

The majority does rely to some extent on the fact that the certificate is not due until six years after issuance, and that the Act's exclusion of obligations having a maturity of less than nine months is therefore inapplicable. The negative inference that the certificate is a security because it is not expressly exempted, however, is not determinative. That is, a note payable in less than nine months may be a security in some situations while a similar obligation of a longer maturity may be outside the Act's ambit in other cases. *McClure v. First National Bank of Lubbock,* 497 F.2d 490, 495 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).

Nor do I believe that *Tcherepnin v. Knight, supra,* holding that withdrawable capital shares in a savings and loan association were securities, controls here. In the majority's view, from the depositor's standpoint the certificate of deposit is functionally equivalent to savings and loan shares. I do not find that argument persuasive because *Tcherepnin* stressed two important considerations—the shares did not entitle the holders to a fixed rate of return but only a share of the profits, and secondly, the shares were transferable. Moreover, the court cited legislative history supporting its position that savings and loan associations were to be governed by the antifraud provisions of the Securities Act. Unlike *Tcherepnin,* no such references can be made to certificates of deposit of a commercial bank. In addition, the Marine Bank certificate bears a fixed rate of interest and represents the bank's obligation to pay a long term debt. It therefore is more akin to a savings account than to the bank's capital stock.

The courts of appeals are not unanimous in their approach to certificates of deposit. In *Bellah v. First National Bank of Hereford*, 495 F.2d 1109 (5th Cir. 1974), the Fifth Circuit distinguished *Tcherepnin* and concluded that on the record before it, a certificate of deposit was not a security. In *Safeway Portland Employees Federal Credit Union v. C. H. Wagner & Co., supra*, the Ninth Circuit held that a combination of a certificate of deposit, which it assumed arguendo was not a security, and a "bonus" would come within the Securities Act.

The Seventh Circuit decided that a certificate representing a currency deposit in a commercial bank, such as that present here, was not a security or investment transaction. *Canadian Imperial Bank of Commerce Trust Co. v. Fingland*, 615 F.2d 465, 470 (7th Cir. 1980). As here, the complaint in *Fingland* failed to include a copy of the document upon which jurisdiction was premised. However, despite the absence of the certificate of deposit, the court was able to distinguish the commercial instrument relied upon there and the investment transaction found in *Tcherepnin*. As the court aptly noted, if *any* document labeled certificate of deposit were a security, "there would no longer be any validity to the distinction between commercial and investment transactions since any depositor in a failed bank could claim the same protection accorded security holders." *Id.*

Taking a different approach, in *SEC v. First American Bank & Trust Co.*, 481 F.2d 673, 678 (8th Cir. 1973), without discussion, the court said that "capital notes, certificates of investment, and passbook savings accounts" in a bank were securities within the scope of the Securities Act. In a footnote, the court referred to the language in the 1933 Act "Any note [or] evidence of indebtedness." The last clause, it must be noted, is not included in the definition in the Securities Exchange Act of 1934, the applicable statute in this case.

Contrary to the implication in the majority opinion, there is a difference between a certificate of deposit issued by a commercial bank and a debt obligation of a corporation in some other line of endeavor. The bank is in the business of borrowing and lending money. With the exception of finance companies and others of that nature, however, corporations generally borrow money to generate capital necessary for costs of operation. Furthermore, bank borrowing and lending activities are closely regulated by designated governmental agencies. Because of this supervision, the need to protect depositors under the Securities Exchange Act is not as apparent as it is with nonbanking entities. This philosophy is also reflected in the many cases that have found bank loans based upon promissory notes not within the scope of the Act. *McClure v. First National Bank of Lubbock, supra* at 492–93; *Bellah v. First National Bank of Hereford, supra.*

The American Law Institute shares this view, for its proposed Federal Securities Code specifically excludes from the definition of security an interest in a deposit account with a bank, and "a bank certificate of deposit that ranks on a parity with an interest in a deposit account with the bank." 1 Ali Fed. Securities Code § 202 (150)(B)(v) (1980). As the Committee comments, although literally one may find an "evidence of indebtedness" or (when interest is paid) an "investment contract," it seems logical to exclude these interests along with traditional insurance policies and annuity contracts from the definition of "security." The exclusion extends to savings and checking accounts, as well as time and demand deposits, but not to custody accounts. The proposed exemption does not apply to savings and loan associations in recognition of the distinction between *Tcherepnin*-type interests and the usual commercial bank transactions.[4]

Since I would hold that the certificate of deposit was not a security, I need not address the issue of whether a pledge constitutes a sale, a point of conflict between the circuits that may soon be resolved by the

---

4. I realize, of course, that it can be argued that the ALI proposal is an indication that the drafters believe that the bank certificate presently comes within the definition in the Exchange Act. Nevertheless, I am more impressed with the implication in the ALI view that inclusion of bank certificates of deposit within the scope of the Securities Act is unnecessary.

Supreme Court. *United States v. Rubin,* 609 F.2d 51 (2d Cir. 1979), *cert. granted,* 445 U.S. 960, 100 S.Ct. 1645, 64 L.Ed.2d 234 (1980).

It is obvious I do not share the majority's view that the 1934 Act was intended to cover virtually every transaction in which an investor might expect to receive a return on his money. *See, e. g., Glick v. Campagna,* 613 F.2d 31, 35 n.3 (3d Cir. 1979); *Collins v. Signetics Corp.,* 605 F.2d 110, 113 (3d Cir. 1979). Although the Securities Act should be interpreted liberally to carry out its purposes, we should also heed the admonition in *Woodward v. Metrobank of Dallas,* 522 F.2d 84, 90 (5th Cir. 1975), "The court must ask whether the conduct in a case before it was the type of behavior meant to be forbidden by the Securities Acts, remembering that business transactions are not all reducible to a purchase or sale of a security." Nor should we "convert § 10(b) of the Securities Act into a source of general federal jurisdiction." *Great Western Bank & Trust Co. v. Kotz, supra* at 1253.

I do not believe that the transactions in the case at hand come within either the spirit or intent of the Securities Exchange Act and accordingly, I dissent.