Ana Laing MEASON, Plaintiff-Appellant,

v.

BANK OF MIAMI, a State Bank and Florida Corp., et al., Defendants-Appellees.

Edith DAVIS, Plaintiff-Appellant,

v.

BANK OF MIAMI, et al., Defendants-Appellees.

Errol S. SCHUTTE and Gloria Schutte, Plaintiffs-Appellants,

v.

BANK OF MIAMI, et al., Defendants-Appellees.

No. 79–3607.

United States Court of Appeals, Fifth Circuit.

Unit B

Aug. 6, 1981.

Rehearing and Rehearing En Banc Denied Sept. 28, 1981.

---

Blackwell, Walker, Gray, Powers, Flick & Hoel, James C. Blecke, Raymond A. Reiser, William L. Gray, III, Miami, Fla., for Meason & Davis.

Fromberg, Fromberg & Roth, Malcolm H. Fromberg, Todd S. Rogel, Miami, Fla., for Schutte & Schutte.

Jacob H. Stillman, Ralph C. Ferrara, David A. Sirignano, Gen. Counsel, Paul Gonson, Linda W. Otto, Elisse B. Walter, David A. Sirignano, S.E.C., Washington, D.C., amicus curiae, S.E.C.

Greenberg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolfe, Marlene K. Silverman, Miami, Fla., for Bank of Miami & Popular, etc.

Weintraub & Rosen, Michael A. Rosen, Bradford, Williams, McKay, Kimbrell, Hamann & Jennings, Bruce C. King, Miami, Fla. for Northside Bank of Miami.

Arthur L. Beamon, Senior Atty., Washington, D.C., for Federal Deposit Ins. Corp.

Victor Hugo Rams, Miami, Fla., for Popular Bank, A. & H. Rodriguez.

Before VANCE, HATCHETT and ANDERSON, Circuit Judges.

VANCE, Circuit Judge:

Plaintiffs appeal from a district court order dismissing their complaints for lack of subject matter jurisdiction. In three separate actions, later consolidated by the lower court, plaintiffs asserted violations of the antifraud and registration provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 in the sale of certificates of deposit issued by an offshore bank of the Grand Cayman Islands. The district court dismissed their suits, ruling that the certificates of deposit are not securities within the meaning of the federal securities laws. Because we conclude that the plaintiffs' claims could not properly be dismissed for lack of subject matter jurisdiction, we reverse and remand.

### Proceedings in the District Court

Errol S. Schutte and Gloria Schutte filed the first of the three consolidated cases involved in this appeal on January 16, 1979. As amended the thirteen count complaint asserted violations of sections 12(1) and (2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1) and (2); section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and state law and common law claims. Federal jurisdiction was predicated on section 22(b) of the Securities

Act of 1933, 15 U.S.C. § 77v;[1] and section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa;[2] and diversity jurisdiction.[3] Named as defendants in the Schuttes' complaint were Bank of Miami, Popular Bancshares Corporation (Bancshares), Northside Bank of Miami, Popular Bank and Trust Co., Ltd. (Popular), Francisco A. Navarro, and Andres F. Rodriguez. Defendants Bank of Miami and Bancshares moved to dismiss the complaint for lack of federal jurisdiction and for failure to state a claim upon which relief could be granted.

The complaints in both the Davis and Meason cases were premised upon facts and claims very similar to those contained in the Schuttes' complaint. The court *sua sponte* consolidated the three cases. After oral argument the district court dismissed the Schuttes' amended complaints and the original complaints of Meason and Davis on September 26, 1979. On October 19, 1979 the court denied the plaintiffs' motions for reconsideration but granted the motion for clarification by stating that the order of dismissal was with prejudice and that no leave to file an amended complaint was granted.[4]

### Factual Allegations

In granting the motions to dismiss, the district court had before it only plaintiffs' complaints. For purposes of a motion to dismiss the allegations of the complaint must be accepted as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). Because the complaints are lengthy and complex a review of the allegations in some detail is appropriate.

Schuttes' amended complaint avers that on April 1, 1977, both Popular and Bank of Miami were wholly owned subsidiaries of defendant Bancshares, a Florida chartered bank holding company. Defendant Bank of Miami is a Florida state bank. Popular, however, is a bank organized pursuant to the law of the Grand Cayman Islands, British West Indies. Popular had no offices of its own and was not licensed to do business in the United States. Instead, it conducted its business through the officers and employees of the Bank of Miami.

On or about April 1, 1977, Errol S. Schutte went to Bank of Miami to transfer certain funds from a checking account into an interest bearing account. There, Schutte met Navarro who was introduced as being in charge of the International Banking Division for Bank of Miami and for Bancshares. Navarro advised Schutte to place his money in a certificate of deposit issued by the defendant Popular since "according to Navarro, Popular was the best investment 'they' had to offer." Navarro also represented to Schutte that "there was no risk and that his money would be perfectly safe since Popular was owned by the

1. 15 U.S.C. § 77v(a) provides in pertinent part:
   The district courts of the United States, and the United States courts of any Territory, shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, and, concurrent with State and Territorial courts, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter.

2. 15 U.S.C. § 78aa provides in pertinent part:
   The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.

3. The district court's ruling that there was no diversity jurisdiction has not been appealed. The lower court found that the Schuttes were citizens of the Netherlands Antilles, and that because a foreign corporation and an alien were defendants that the case was essentially a suit between aliens, and could not be "considered by this court under diversity of jurisdiction" (citing 13 C. Wright & A. Miller, Federal Practice and Procedure § 3604 (1975)).

4. The district court also issued an order explaining that the dismissal "did not reflect any adjudication on the merits of the plaintiffs' claims" and that the dismissal "reflected the court's opinion that plaintiffs had not and could not, if leave to amend were granted, invoke this court's subject matter jurisdiction."

same company which owned Bank of Miami, to-wit: Bancshares." Schutte bought a $250,000 Popular certificate in his and his wife's names. On August 18, 1977 an additional transfer of $50,000 was authorized by the Schuttes to buy a second certificate.[5]

The Schuttes allege that on February 16, 1978 Bancshares sold Popular to defendant Rodriguez and others.[6] The Schuttes were advised of this transaction by letter dated March 7, 1978. According to their complaint, on May 31, 1978 Schutte attempted to contact defendant Navarro for the purpose of redeeming his certificates of deposit. He was told at the Bank of Miami that Navarro could be contacted at the Northside Bank, which had also been purchased by defendant Rodriguez. When Schutte finally reached Navarro at Northside, Navarro informed him that Popular was now owned by Northside and that although Popular was no longer owned by Bancshares, it was still owned by a United States bank and was continuing business as usual. On the basis of these representations Schutte agreed to roll over his certificates of deposit. He tendered his old certificates and received new certificates for all the sums he had previously placed with Popular through Bank of Miami and Bancshares. Subsequently, on June 5, 1978 Schutte presented a cashier's check for $132,415.06 to Navarro at Northside requesting that Navarro deposit $130,000 in an interest bearing account in his behalf and pay over to him the remaining balance. Schutte never received a certificate of deposit for this transaction.

On June 30, 1978 Errol Schutte went to Northside to redeem his certificates. He was informed by Navarro that Popular did not have sufficient funds within the United States but that there were more than sufficient funds in the Grand Cayman Islands and that he would contact Schutte when the funds had been transferred. Schutte did not wait for the transfer. He flew to the Grand Cayman Islands but was unable to locate any office or establishment known as the Popular Bank and Trust Co., Ltd. He discovered that Popular was conducting business through a subsidiary of a Canadian company. The Canadian agent informed Schutte that Popular did not have sufficient funds to redeem any of his certificates of deposit, not even one for $2,576.59.

The factual allegations upon which plaintiffs Davis and Meason base federal jurisdiction are similar to those pled by the Schuttes. The Meason complaint alleges that Angela Bernal, the mother of Ana Laing Meason, purchased certificates of deposit issued by the Bank of Miami prior to 1974. In October 1976 Bernal was introduced to Navarro who advised her to purchase from Bank of Miami a certificate of deposit issued by Popular. She was advised, according to allegations in her complaint, "that her money was just as safe in Popular as if deposited in Bank of Miami ... that the purchase of said certificate of deposit was a safe investment in that Popular was solvent and able to meet its obligations ... that the plaintiff's money would be handled by Bank of Miami, Bancshares and Popular in good faith and in a reasonably prudent manner in order to protect her investment."[7]

---

5. Although the plaintiffs refer to these instruments as certificates of deposit in their complaint, the record reflects that they were labeled "Term Deposit Account in U.S. Dollars" on the face of the instrument. As the Supreme Court stated in *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), in attempting to determine whether an instrument is a security, "form should be disregarded for substance."

6. Plaintiffs allege that the sale of Popular to the Rodriguez group was a "bootstrap" acquisition in view of the fact that most of the considera-

tion paid to Bancshares was obtained by converting the assets of Popular.

7. Meason's complaint, as well as those of Davis and Schutte, alleges that she was not advised of the following material facts:

(a) that Popular was not licensed or allowed to do business legally in the United States or the State of Florida;

(b) that Popular was not under the control or supervision of the United States, any of its agencies, the State of Florida, or any of its agencies;

The Meason complaint further alleges that on October 11, 1976 Angela Bernal purchased two certificates of deposit from the Bank of Miami and Bancshares issued by Popular in the amounts of $127,000 and $144,700 with a maturity date of October 6, 1977. Meason did not receive the original certificates of deposit but was "induced" to leave the original certificates with Navarro at the Bank of Miami, which gave her a receipt for them. Without the permission of Angela Bernal or Meason the proceeds of these certificates of deposit were used on December 5, 1977 to purchase two more certificates of deposit in the same amount which had a new maturity date of December 5, 1978.

Edith Davis avers that in September of 1977 she purchased a $500,000 Popular certificate of deposit from Navarro who advised her that it was a safe investment, that the Bank of Miami and Bancshares would vouch for the security of the investment and that their assets stood behind Popular. Davis further alleges that she was induced to leave the original certificate in safekeeping at Bank of Miami by Navarro who receipted the same for Popular.

The plaintiffs' certificates were not paid by defendants notwithstanding presentment and demand.

### Standard for Dismissal

In dismissing the complaints the district court stated that "the dispositive issue in this case is clearly whether the 'certificates of deposit' involved in the various transactions are securities within the federal securities laws." Initially, the court noted that the proper analysis of the issue required an "examination of the economic realities of the transactions involved." Relying on a test formulated in *Securities and Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) for

determining whether a transaction is an investment contract under the securities laws, the district court concluded that the certificates of deposit were not securities and dismissed for lack of subject matter jurisdiction.

█ The district court's dismissal cannot be reconciled with the standard established in *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) that a complaint should not be dismissed for lack of subject matter jurisdiction unless the federal claim is "immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." *Id.* at 682–83, 66 S.Ct. at 776. As stated by the Court in *Bell v. Hood,*

> Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

*Id.* at 682, 66 S.Ct. at 776. *Accord, Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). *See also* 13 C. Wright &

(c) that Popular was not insured by the Federal Deposit Insurance Corporation or by any other such entity;

(d) that Popular was an entity totally separate from Bank of Miami or Bancshares which could be sold to anyone at any time without notice to or permission of plaintiff;

(e) that Popular was making investments contrary to state and federal banking laws, rules and regulations and contrary to generally acceptable banking practices in the United States and the State of Florida.

A. Miller, Federal Practice and Procedure § 3564 at 428 (1975) ("The test for dismissal is a rigorous one and if there is any foundation of plausibility to the claim federal jurisdiction exists.").

This circuit has held that a question of whether certain transactions are securities within the meaning of the federal securities laws should not be determined on a motion to dismiss for lack of subject matter jurisdiction unless the complaint fails to meet the standards of *Bell v. Hood. See Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981); *Bell v. Health-Mor, Inc.*, 549 F.2d 342, 344 (5th Cir. 1977); *Hilgeman v. National Insurance Co. of America*, 547 F.2d 298, 300 (5th Cir. 1977). In our extensive discussion in *Williamson v. Tucker* we cited our decision in *Bell v. Health-Mor, Inc.* for the proposition that "the *Bell v. Hood* standard is met only where the plaintiff's claim 'has no plausible foundation' or 'is clearly foreclosed by a prior Supreme Court decision.'" *Williamson*, 645 F.2d at 416 (quoting *Bell v. Health-Mor, Inc.*, 549 F.2d at 344) (footnote omitted). We went on to state that "the definition of the term 'security' in the context of a suit based on the federal securities laws may reach the merits of the case and thereby limit the court's discretion to dismiss for lack of subject matter jurisdiction." *Id.* (citing *Hilgeman* and *Bell v. Health-Mor*). In such a case, providing that the standards of *Bell v. Hood* are met, the proper course "is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Williamson*, 645 F.2d at 415.

■ For the reasons set forth below, we believe that plaintiffs' assertion that the certificates of deposit are securities is not so immaterial or insubstantial as to allow dismissal for lack of jurisdiction. This is not a case where the claim lacks plausible foundation or is clearly foreclosed by a prior Supreme Court decision. Although we do not decide whether plaintiffs purchased a security it is clear that plaintiffs' allegations are sufficient to preclude determination of this issue on a motion brought under Fed.R. Civ.P. 12(b)(1).

### The Commercial-Investment Dichotomy

As noted, the district court in dismissing this action relied heavily on the Supreme Court's definition of an investment contract under the securities laws:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party....

*Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–1103. Applying the *Howey* test the district court held that "[a]lthough these certificates are clearly investments in that plaintiffs deposited currency with defendants in return for the certificate with the expectation of earning a certain rate of interest, they clearly were not procured with the reasonable expectation of profits solely from the efforts of others." The court explained that "[t]he certificates simply reflect the amount of currency deposited with a banking institution for an agreed upon period of time."

Plaintiffs argue that as a matter of law the certificates of deposit issued by Popular are securities or at the very least that a question of fact exists as to whether the certificates were purchased for any investment purpose. Plaintiffs contend the applicable test is whether the purchase was made as an investment or whether it was of a commercial nature. Their argument focuses on the district court's acknowledgement that the instruments were investments. They argue that the promise to pay a fixed return makes these instruments similar to an investment promissory note, a bond, a debenture or some other speculative investment with a fixed return.

The Securities and Exchange Commission entered the case as *amicus curiae* because of its belief that the district court construed

the definition of a security too narrowly.[8] The SEC expresses concern that the lower court's ruling that the purchasers could not expect profits because of the fixed return might affect other securities with a fixed return.[9] In this and in other federal courts [10] the SEC advances its opinion that in various circumstances involving certificates of deposit and similar bank instruments securities are involved. The Commission contends that the instruments sold by the defendants are securities and that the true economic reality is that solicitation of investors' funds was not significantly different from any corporate enterprise seeking debt financing. It opines that an investment contract is only one of the many kinds of securities and that the district court's reliance on the *Howey* test is therefore misplaced. While recognizing the exemption of certain securities issued by banks from the registration requirements under section 3(a)(2) of the Securities Act, 15 U.S.C. § 77c(a)(2), the Commission claims that the exemption does not apply to this case because the certificates were issued by a foreign bank. It points out in addition that although bank securities are exempt

from registration they are not exempt from the antifraud prohibitions of section 10(b).[11] We note that as the agency established by Congress to administer the securities laws the Commission's interpretation of the Acts is entitled to considerable weight. *E. I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1977); *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975). *See also Saxbe v. Bustos*, 419 U.S. 65, 74, 95 S.Ct. 272, 278, 42 L.Ed.2d 231 (1974).[12]

We agree that the district court placed excessive reliance upon the test articulated in *Howey*. This court has avoided applying a single rigid test in determining the existence of a security. Instead, we have repeatedly stressed that a court must examine the economic realities of the transaction in question to decide whether it is appropriately characterized as commercial or investment in nature.

This approach is rooted in the language and history of the securities laws and the decisions of the Supreme Court. In drafting the Securities Act of 1933,[13] Congress

---

**8.** We note that other *amicus* briefs have been filed as well including that of the Federal Deposit Insurance Corporation.

**9.** Other courts have not been restricted by a concept of a fixed return in deciding whether a transaction was covered by the definition of a "security." *See, e.g., El Khadem v. Equity Securities Corp.*, 494 F.2d 1224, 1229 (9th Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974); *SEC v. Nat'l Executive Planners, Ltd.*, 503 F.Supp. 1066 (M.D.N.C. 1980); *SEC v. G. Weeks Securities, Inc.*, 483 F.Supp. 1239, 1243–44 (S.D.Tenn.1980).

**10.** *See, e.g., Adato v. Kagan*, 599 F.2d 1111 (2d Cir. 1979); *Burrus, Cootes & Burrus v. MacKethan*, 537 F.2d 1262 (4th Cir.), *opinion vacated*, 545 F.2d 1388 (1976), *cert. denied*, 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977); *Safeway Portland Employees' Federal Credit Union v. C. H. Wagner & Co.*, 501 F.2d 1120 (9th Cir. 1974).

**11.** *See Weaver v. Marine Bank*, 637 F.2d 157, 164 (3d Cir. 1980); 2 A. Bromberg & L. Lowenfels, Securities Fraud & Commodities Fraud § 6.5 (1979).

**12.** The Supreme Court in *International Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n.20, 99

---

S.Ct. 790, 800 n.20, 58 L.Ed.2d 808 (1979) explained:

> This deference is a product both of an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time. But this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history. On a number of occasions in recent years this Court has found it necessary to reject the SEC's interpretation of various provisions of the Securities Acts. See *SEC v. Sloan*, 436 U.S. 103, 117–119, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 41 n.27 [97 S.Ct. 926, 949 n.27, 51 L.Ed.2d 124] (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212–14 [96 S.Ct. 1375, 1390–1391, 47 L.Ed.2d 668] (1976); *Forman*, 421 U.S. at 858 n.25 [95 S.Ct. at 2063 n.25] ....

**13.** Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1) defines a "security" as

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing

sought to define "the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.R.Rep.No.85, 73d Cong., 1st Sess., 11 (1933). *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 339, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967). As explained by the Supreme Court in *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943): "In the Securities Act the term 'security' was defined to include by name or description many documents.... [T]he reach of the Act does not stop with the obvious and commonplace." Accordingly, the Court has concluded that the Exchange Act and the Securities Act should be construed broadly to effectuate the statutory policy affording extensive protection to the investing public. *See Tcherepnin*, 389 U.S. at 336, 88 S.Ct. at 553. *See also* S.Rep.No.47, 73d Cong. 1st Sess. 1 (1933) (indicating legislative intent of the Securities Act to protect the public from the sale of fraudulent and speculative schemes).[14]

The Supreme Court has consistently taken a functional approach in distinguishing "securities" from "non-securities."[15] In *Howey* the Court noted that state courts

had construed the term investment contract broadly with an eye to economic realities and in *Tcherepnin* it similarly emphasized that "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." 389 U.S. at 336, 88 S.Ct. at 553 (citing *Howey*). An examination of economic realities dominated the analysis of the Court in *Forman* and in *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), where the Court emphasized that the *Howey* test was to be applied in light of the "economic realities of the transaction." *Id.* at 558, 99 S.Ct. at 795.

Although the Supreme Court has observed that the *Howey* test "in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security," *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060, it has never suggested that the test is to be invoked ritualistically whenever the existence of a security is at issue. Instead, the Court has applied the *Howey* test when considerations pertinent to an investment contract applied to the instrument in question. Thus in *Tcherepnin* the Court applied the *Howey* test only after deciding that "[o]f the several types of instruments designated as securities by

agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The definition of a "security" in section 3(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) is "virtually identical," *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), the latter Act omitting "evidence of indebtedness." *Accord, McClure v. First National Bank of Lubbock, Texas*, 497 F.2d 490, 493 n.1 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). *See also* S.Rep.No.792, 73d Cong. 2d Sess., 14 (1934).

14. The remedial purposes of the Act were expressed as follows:

The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion ....

15. For a discussion of some of the problems that have developed in defining a security *see* Deacon and Prendergast, *Defining a "Security" After the* Forman *Decision*, 11 Pacific L.J. 213 (1980); Newton, *What is a Security? A Critical Analysis*, 48 Miss.L.J. 167 (1977); Comment, *International Brotherhood of Teamsters v. Daniel: Security or Insecurity?* 48 UMKC L.Rev. 108 (1979).

§ 3(a)(10) of the 1934 Act, the petitioners' shares most closely resemble investment contracts." 389 U.S. at 338, 88 S.Ct. at 554. In *Forman* the Court applied the *Howey* test after stating that "[w]e perceive no distinction, for present purposes, between an 'investment contract' and an 'instrument commonly known as a "security." ' " 421 U.S. at 852, 95 S.Ct. at 2060. As this circuit has noted, "the *Howey* test is not possessed of . . . talismanic quality" even in defining an investment contract, *SEC v. Koskot Interplanetary, Inc.*, 497 F.2d 473, 481 (5th Cir. 1974), and we have observed that the Supreme Court in *SEC v. United Benefit Life Insurance Co.*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) has found the existence of an investment contract under the securities laws without citing *Howey.* *Id.*

We have recognized that the Supreme Court has rejected a literal application of the definitional sections of the Securities Acts. *United American Bank of Nashville v. Gunter*, 620 F.2d 1108, 1114 (5th Cir. 1980). In similarly rejecting this approach we have stated "that a note's status as a security depends on whether it can be characterized as commercial or investment in nature." *Id.* at 1115. We adopted this "commercial-investment dichotomy" in *Bellah v. First National Bank*, 495 F.2d 1109 (5th Cir. 1974) and have reaffirmed this mode of analysis in several subsequent cases involving notes. *See, e. g., Gunter; National Bank of Commerce v. All Ameri-*

*can Assurance Co.*, 583 F.2d 1295 (5th Cir. 1978); *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974); *McClure v. First National Bank of Lubbock, Texas*, 497 F.2d 490 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).[16] *See also* Annot. 39 A.L.R.Fed. 357 (1978).

The *Bellah* court applied the commercial-investment dichotomy not only to notes but to certificates of deposit as well. Although the court found the investment characteristic lacking in the certificate of deposit at issue, it modified the dismissal of the suit to permit the plaintiffs to pursue the theory that the certificate of deposit was a security. 495 F.2d at 1114–16. *See also Reid v. Hughes*, 578 F.2d 634, 638 (5th Cir. 1978) (recognizing that "in certain situations a certificate of deposit can be a security as that term is used in the Act. . . . "). In formulating the commercial-investment dichotomy, the court in *Bellah* perceived that it was articulating the same concerns underlying the test stated in *Howey* which the court cited for its emphasis on the "investment nature of an enterprise." 495 F.2d at 1115 n.8. *Cf. Gunter*, 620 F.2d at 1114–15 (indicating the interrelated character of the *Howey* test and the commercial-investment dichotomy approach).[17]

Applying the preceding discussion of the law to the case at bar, it is apparent that by dismissing this suit for lack of subject matter jurisdiction, the district court foreclosed the inquiry into the economic realities of

---

**16.** *See generally* Sonnenschein, *Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions*, 35 Bus.Law. 1567, 1588 (1980); Comment, *Bank Loan Participations as Securities: Notes, Investment Contracts, and the Commercial/Investment Dichotomy*, 15 Duquesne L.Rev. 261 (1977); Comment, *Notes as Securities Under the Securities Act of 1933 and the Securities Exchange Act of 1934*, 36 Md.L. Rev. 233 (1976); Comment, *When is a Note a Security?* 18 Santa Clara L.Rev. 757 (1978).

**17.** Although the same principles underlie the *Howey* test and other approaches to determining the existence of a security, Judge Friendly has pointed to the difficulty in any attempt to give *Howey* universal application in *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1136 (2d Cir. 1976):

Frequent reference is made to the test laid down by the Supreme Court in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301 [66 S.Ct. 1100, 1104, 90 L.Ed. 1244] (1946), in defining what constitutes an "investment contract," namely "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Although the Court has recently said that this "embodies the essential attributes that run through all of the Court's decisions defining a security," *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 [95 S.Ct. 2051, 2060, 44 L.Ed.2d 621] (1975), the Court has not yet had the note problem before it, and the test seems to us to be of dubious value in that context.

the transactions necessary to determine the existence of a security.[18] On remand, the district court should utilize *Bellah*'s commercial-investment dichotomy in analyzing whether this certificate of deposit is a security.[19] It must examine the transactions to determine the "investment character of the scheme." *Bellah*, 495 F.2d at 1115.[20] We note, however, that the lower court's reliance on *Bellah* for the proposition that these transactions merely reflected currency deposited in a bank is misguided. This is not an ordinary banking transaction in which "currency" was deposited. Rather, a state chartered bank was allowing the sale of "term deposits" in a foreign bank to be sold on its premises by one of its officers.

The district court's order of dismissal for lack of subject matter jurisdiction must be reversed because plaintiffs' claims that their transactions involved a "security" are not immaterial or insubstantial. *See Bell v. Hood*. As did the court in *Bellah* we remand so that appellants may attempt to demonstrate the investment character of their certificates of deposit.

REVERSED and REMANDED.

**18.** Other courts have refused to grant a motion to dismiss before discovery of facts necessary for the plaintiff to establish jurisdiction. *See, e.g., Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254 (1st Cir. 1966); *Collins v. New York Central System*, 327 F.2d 880 (D.C.Cir.1963).

**19.** We note, however, that several courts have decided that a certificate of deposit may be a security under the federal securities law without applying this dichotomy. *See Weaver v. Marine Bank*, 637 F.2d 157, 164 (3d Cir. 1980) (explaining that certificates of deposit are the functional equivalents of the withdrawable capital shares in a savings and loan association ruled to be securities in *Tcherepnin*); *MacKethan v. Peat, Marwick, Mitchell & Co.*, 439 F.Supp. 1090, 1094 (E.D.Va.1977) (recognizing that for purposes of a motion to dismiss that

the *Forman* test had been met); *Garner v. Pearson*, 374 F.Supp. 591, 596 (M.D.Fla.1974) (finding that time deposits were securities).

**20.** Although the lower court cited *Bellah* as support for its decision, it did not utilize *Bellah's* commercial-investment dichotomy for analyzing whether a certificate of deposit is a security. Additionally, the two district court cases relied on by the lower court, *Hamblett v. Board of Savings and Loan Associations*, 472 F.Supp. 158 (N.D.Miss.1979); *Hendrickson v. Buchbinder*, 465 F.Supp. 1250 (S.D.Fla.1979), provide little support for a ruling that no security was involved because they incorrectly apply the investment contract test without analyzing the commercial versus the investment character of the transactions.