**Allan R. COCKLEREECE**

v.

**Dora Dodge MORAN, et al.**

v.

**Terrence B. PHILLIPS.**

Civ. A. No. 78–10 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Jan. 27, 1982.

Joseph J. Schafrik, Magaro & Schafrik, Martin D. Chitwood, Stowers, Roane & Carley, Atlanta, Ga., for plaintiffs.

Sidney O. Smith, Alston, Miller & Gaines, R. B. Bernhardt, Bonnie Futch, Atlanta, Ga., Irving M. Weiss, P.A., Pompano Beach, Fla., J. Britten Miller, Jr., Ellijah, Ga., Joseph Crooks, Jones, Bird & Howell, Paul W. Sloniowski, F. Carter Tate, Kidd, Pickens & Tate, J. M. Raffauf, Atlanta, Ga., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

Plaintiff in this action for damages alleges violations of the federal and state securities laws, common law fraud, and breach of contract. The action is currently before the court on the motion of defendants Coopers and Lybrand (United States) (hereinafter "C&L(U.S.)") and Coopers and Lybrand (International) (hereinafter "C&L(I)") for summary judgment, Rule 56, Fed.R.Civ.P.

## I. FACTUAL BACKGROUND

This case involves an alleged "advance money scheme." According to the plaintiff's complaint, in June 1977, T. P. McGlon visited the office of plaintiff's accountant and financial advisor, Terrence B. Phillips, and represented that various entities and associates, including James W. Feeney, Daniel and Dora Moran, Natural Resources, S.A., Darnley Investments, Ltd., Hartford Construction Company, Ltd., and Phillip J. Fleming (hereinafter "Funding Group") could make their assets available to obtain guaranteed loans for Phillips' clients. While discussing the possibility of this arrangement with Phillips, McGlon showed Phillips the 1975 financial statement of First Charter Corporation,[1] allegedly pre-

---

1. The document allegedly shown to Phillips contained an unqualified audit opinion of First Charter Corporation and the financial statement of First Charter Land Associates and Affiliates, a separate corporation. Defendants claim that while the audit opinion was prepared by C&L(U.S.) and was genuine, the financial statement was a forgery. Affidavit of John Silton at ¶ 4. Addressing this point, the plaintiff states that he does not have access to the information necessary to establish that the financial statements are authentic; and furthermore, that for purposes of this motion the court need only consider the unqualified audit opinion of First Charter Corporation "since the unqualified opinion was the *sine qua non* for Cocklereece to consider the remainder of the First Charter financial statements." Plaintiff's Brief in Opposition to Defendants' Motion for

pared by C&L(U.S.), and the 1976 financial statement of Tamarind Developments (Grand Bahama) Ltd. (hereinafter "Tamarind"), prepared by C&L(Bahamas).[2] McGlon represented that he and Fleming owned a controlling interest in First Charter and fifty-four percent of Tamarind's stock, and that the assets of these two companies would be available for use in securing a loan. Phillips Dep. at 82.

In July 1977, allegedly as a consequence of this representation, Phillips arranged for the plaintiff to secure a $2,000,000 loan through the Funding Group for the purpose of purchasing McDaniel Printing Company, Inc. The transaction purportedly involved several components. Cocklereece agreed to advance $30,000 into escrow as a deposit. Complaint at ¶ 27; Defendants' Brief in Support of Motion for Summary Judgment, Exh. 1 (hereinafter "Defendants' Brief"). Upon receiving this sum, Feeney, president of Oaks-Darby Ltd., promised that the Funding Group would pledge their assets to a Panamanian bank in return for a $2,000,000 certificate of deposit drawn in the name of the Funding Group. Cocklereece Dep. at 23–24, 26. This certificate would then be placed in a domestic bank as collateral for a loan to be made out to Cocklereece. The terms of the financing were specified in a loan commitment letter sent by Feeney to Cocklereece:

> The cost of said financing will be nine percent per year for the use of the Certificate of Deposit as more fully described in our conversations. The commitment will be issued for three years. Two years interest to be paid as described below with an option by borrower of one additional year of financing with the next years five percent interest being paid upon exercise of said option.

> You will remit thirty thousand dollars upon signing of this agreement and an additional three hundred thirty thousand dollars to be paid upon closing.

Defendants' Brief, Exh. 1. Thus, Cocklereece agreed to pay a nine percent annual return on the $2,000,000 in advance for two years at the closing of the loan. Although Cocklereece paid the $30,000 escrow deposit to Oaks-Darby, the defendants did not procure the loan or return his money.

Plaintiff alleges that he agreed to pay the $30,000 to secure the loan on the basis of his accountant's evaluation of the financial statements of First Charter and Tamarind which were allegedly prepared by a C&L entity. These statements, submitted to Phillips by McGlon, were reviewed to

Summary Judgment at 6 (hereinafter "Plaintiff's Brief"). Plaintiff then argues that:

> An accountant reviewing an audit opinion first looks to see if the opinion is unqualified (to determine whether he can rely upon the opinion stated); if the opinion is qualified, the accountant can look no further; if it is unqualified he then looks to the financial statements to determine the net worth. Had the First Charter auditor's report been qualified, Phillips, on behalf of Cocklereece, would have looked no further; the First Charter audit opinion would not have been an inducement for Cocklereece to invest.

Id. at 6–7.

This argument is not a model of clarity. On one hand, plaintiff apparently asks this court to disregard the 1975 financial statement of First Charter Associates and Affiliates conceding that he cannot prove the authenticity of the First Charter Land Associates financial statement. On the other hand, the plaintiff predicates C&L(U.S.)'s liability on the financial statement, by arguing that when an audit opinion is unqualified, as First Charter Corporation's was, an accountant looks to the financial

statement to determine the corporation's net worth. Adding to the confusion, plaintiff argues later in his Supplementary Brief, filed November 12, 1980, that he relied on the unqualified opinion and the financial statement to determine that First Charter Corporation had sufficient assets to collateralize a $2,000,000 loan. Plaintiff's Supplementary Brief in Opposition to Defendants' Motion for Summary Judgment at 8, ¶ 10. In the court's view, plaintiff's concession as to the financial statement is inconsistent with his factual argument. We cannot explain this inconsistency; however, for the sake of simplicity, the court will refer to the entire document shown to Phillips as the "First Charter financial statement."

2. Defendants concede that C&L(Bahamas) prepared the 1976 Tamarind Developments Ltd. financial statement. Affidavit of F. J. Snowden, Defendant's Brief in Support of Motion for Summary Judgment, Exh. 5. By order dated September 29, 1980, this court dismissed C&L(Bahamas) from the instant lawsuit for lack of personal jurisdiction.

determine whether the equity of the two companies was sufficient collateral to obtain a $2,000,000 certificate of deposit from a Panamanian bank. Allegedly, because the statements were essentially unqualified [3] and reflected sufficient equity, plaintiff agreed to pay his money to the Funding Group.

Several months later, after determining that his loan was not forthcoming, Cocklereece investigated the members of the Funding Group and examined the audit opinions and financial statements shown to his accountant. To his great surprise, Cocklereece discovered that he had been defrauded by the Funding Group. As to the C&L defendants, Cocklereece claims that the audit opinions of First Charter and Tamarind on which he relied contained accounting irregularities and, in addition, should have been qualified due to C&L's lack of independence. Cocklereece argues, if they had been qualified, he would not have advanced any money to the Funding Group.

In support of these contentions, the plaintiff points, *inter alia*, to the following: that various members of C&L(Bahamas) owned a majority interest in Tamarind at the time the audit was issued, Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Plaintiff's Brief"), Exh. 3 at 7, Exh. 2 at 4–5; that C&L(Bahamas) had negotiated with McGlon and Fleming for Darnley Investments, Ltd.[4] to acquire an option to purchase the majority stock in Tamarind, *Id.*, Exh. 2 at 4; that C&L(Bahamas) was in business with McGlon and Fleming, Plaintiff's Brief at 5; and that McGlon and Fleming had a claim to title for a substantial interest in First Charter, *Id.*, Exh. 3 at 9–10.

Defendants portray the details of the loan scheme in the same light as the plaintiff: Cocklereece gave $30,000 to Oaks-Darby on the assurance that Oaks-Darby would obtain for him a Panamanian certificate of deposit. However, the similarity ends there. Defendants argue that although McGlon represented that the Funding Group owned an interest in First Charter and Tamarind and would be able to pledge the assets of these entities to obtain a certificate of deposit, in fact, no member of the Funding Group owned any stock or interest in either of these two companies nor had any right to pledge their assets. Hence, "McGlon might just as well have represented to Cocklereece that the Funding Group owned 54% of IBM, General Motors, or any one or more of the Fortune 500 Companies." Defendants' Brief at 14.

With respect to C&L(I)'s alleged liability for the fraudulent loan scheme, defendants insist that C&L(I) did not prepare any financial statements involved in the lawsuit and had no relationship whatsoever with Tamarind, First Charter, Phillips, Cocklereece or any other member of the Funding Group and did not receive any of the $30,000 escrow deposit. As to C&L(U.S.)'s alleged involvement, defendants argue that the only nexus between C&L(U.S.) and the scheme is the 1975 First Charter Corporation opinion and First Charter Land Associates financial statement presented to Phillips as part of the back-up information substantiating the assets owned by the Funding Group. Defendants urge that the latter document was a forgery and was not prepared by C&L(U.S.).[5]

## II. THE HISTORY OF THIS LAWSUIT

On January 5, 1978 the plaintiff filed suit based on diversity of citizenship against

---

**3.** According to generally accepted auditing standards in the United States, an audit opinion is required to be qualified when the accountant preparing the opinion is not independent. Plaintiff's Brief, Exh. 2 at ¶ 9. The First Charter statement was completely unqualified. The Tamarind statement was qualified but not as to C&L(Bahamas)'s alleged lack of independence.

**4.** Plaintiff alleges that Darnley Investments, Ltd. was at this time wholly owned by McGlon and Fleming.

**5.** In their brief, defendants apparently argue that both the First Charter audit opinion and financial statement were forgeries. Defendant's Brief at 21. However, John Silton establishes in his affidavit that only the financial statement was a forgery.

members of the Funding Group and related entities—Daniel and Dora Dodge Moran, Thomas P. McGlon, Phillip J. Fleming, James W. Feeney, Natural Resources, S.A., Intercontinental Investments, Inc., Darnley Investments, Ltd., Hartford Construction Company, Ltd., Michael Marion, Jean Feeney, Lionel Leeds, and Oaks-Darby, Ltd., alleging common law fraud and breach of contract. In July 1978, plaintiff's motion for leave to amend the complaint to add federal and state securities claims and to add C&L(I), C&L(U.S.), C&L(Bahamas), and other Funding Group members—Theresa McGlon, and Augustin J. San Fillipo—as defendants was granted. Thereafter, in August 1978, defendants C&L(I) and C&L(U.S.) filed a third party complaint against Terrence B. Phillips, plaintiff's accountant. Subsequently, by order dated September 29, 1980, C&L(Bahamas) was dismissed from the lawsuit for lack of personal jurisdiction; and by orders dated March 2, 1981 and May 6, 1981, several members of the Funding Group were voluntarily dismissed without prejudice.[6]

As amended, the plaintiff's complaint is cast in seven counts. Counts I and II allege common law fraud and breach of contract, respectively. Counts III, IV, VI, and VII state various causes of action under the Securities Act of 1933, 15 U.S.C. §§ 77o, 77c, 77l(1), (2), 77q(a), and the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78t, 78j(b). Finally, in Counts III, V, and VI, plaintiff asserts claims under the state securities laws, Ga.Code Ann. §§ 97–112, 114.

In support of their motion for summary judgment, defendants advance three principal arguments: (1) that none of the alleged errors or omissions in either the Tamarind or First Charter financial statements proximately caused the loss suffered by Cocklereece; (2) that, as a factual matter, C&L(I) did not participate in the fraudulent loan scheme and did not audit either the Tamarind or First Charter financial statements, and that C&L(U.S.) prepared neither the forged First Charter statement nor the Tamarind statement; and, (3) that the particular counts of the complaint are defective as a matter of law, and alternatively, that the counts are unsupported by evidence sufficient to survive a motion for summary judgment.[7]

In response, the plaintiff asserts that the defendants' motion should be denied on several grounds. First, plaintiff argues that the defendants are responsible for the actions of C&L(Bahamas) under the doctrine of partnership by estoppel. Second, plaintiff contends that accountants owe a special duty of care to third parties in preparing financial audits. Finally, plaintiff insists that there are no legal or factual deficiencies in any of the particular counts of the amended complaint.

The parties in this complex and protracted case devote a significant portion of their voluminous briefs to a discussion of whether or not there is a genuine issue as to any material fact. However, since this court's subject matter jurisdiction over the C&L defendants is grounded on the defendants' alleged violations of the federal securities

---

**6.** The following defendants were dismissed: International Financial Investments, Inc., Hartford Construction Company (Bahamas) Ltd., Augustin J. San Fillipo, Theresa McGlon, Phillip J. Fleming, Daniel Moran, Natural Resources S. A., Jean Feeney, Michael Marino, Lionel Leeds, Oaks-Darby Ltd., and Thomas P. McGlon.

**7.** In addition, the defendants urge that: (1) Cocklereece was neither the purchaser nor seller of a "security;" (2) Section 17(a) of the Securities Act of 1933, on which plaintiff premises Counts IV and VI, does not afford a private

cause of action; (3) the requirement under Sections 12(1) and 12(2) of the Securities Act of 1933, the basis of Counts III, IV and VI, that a seller's active participation be a substantial factor in the sale of securities is lacking; (4) the elements of a cause of action under section 10(b) of the Securities Exchange Act of 1934, Count VII, have not been satisfied; (5) the elements of common law fraud and breach of contract, required in Counts I and II, have not been demonstrated; and, (6) since the loan commitment is not a "security" within the meaning of the Georgia Securities Act, plaintiff's state claims in Counts III, V, and VI fail.

laws,[8] the court will first address the question whether Cocklereece was the purchaser of a "security" within the meaning of the federal securities laws.

## III. WHETHER THE LOAN COMMITMENT CONSTITUTES A SECURITY

█ As a threshold matter, the court notes, contrary to plaintiff's contention,[9] that the issue of whether a transaction constitutes a security is properly presented in a motion for summary judgment. In *Meason v. Bank of Miami*, 652 F.2d 542 (5th Cir. 1981) the Fifth Circuit recently observed that this issue should not be determined on a motion to dismiss for lack of subject matter jurisdiction unless the plaintiff's claim "has no plausible foundation" or "is clearly foreclosed by a prior Supreme Court decision." *Id.* at 547. Because the definition of the term "security" in the context of a suit based on the federal securities laws may reach the merits of a case and thereby limit the court's discretion to dismiss on jurisdictional grounds, the Fifth Circuit advised that "the proper course 'is to . . . deal with the objection as a direct attack on the merits of the plaintiff's case.'" *Id.*, quoting

*Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981). Since the instant case has been litigated in this court for approximately four years and extensive discovery has been completed, the court finds the consideration of the question whether this transaction involves a security to be appropriate.

The transaction at issue in this case allegedly consisted of three stages. First, Cocklereece agreed to pay $30,000 to Oaks-Darby Ltd., as a deposit on the interest for a three-year loan commitment. Second, the Funding Group promised to pledge its assets to a Panamanian bank as collateral for a $2,000,000 certificate of deposit. To acquire the certificate, Cocklereece agreed to advance two years interest at an annual rate of nine percent upon exercising the option. *See* Defendant's Brief, Exh. 1. Finally, the Funding Group represented that it would place the certificate of deposit with a domestic bank as collateral for a loan to be made out to Cocklereece. Phillips Dep. at 184–87. Although Cocklereece paid $30,000 to Oaks-Darby Ltd. as requested, no certificate of deposit or loan was ever issued.[10] Thus, in determining whether

8. There is no diversity jurisdiction alleged between the plaintiff and the C&L defendants. Plaintiff is a citizen of Georgia, whereas C&L(U.S.) is a partnership some of whose partners are citizens of the state of Georgia and C&L(I) is an international association of member firms. *See* Order dated September 29, 1980. Since the citizenship of a partnership for diversity purposes is determined by the citizenship of all its partners, no diversity jurisdiction can exist with C&L(U.S.) Wright and Miller, *Federal Practice & Procedure: Civil* § 3630. Furthermore, since an unincorporated association's citizenship is deemed to be the same as that of its members, Wright and Miller, *Federal Practice & Procedure: Civil* § 1861, diversity jurisdiction against C&L(I) is defeated.

9. Plaintiff insistently argues that the Fifth Circuit's holding in *Meason v. Bank of Miami*, 652 F.2d 542 (5th Cir. 1981) precludes summary judgment in this case. *Meason*, however, involved a motion to dismiss and not, as here, a motion for summary judgment.

10. Even assuming that a certificate of deposit or promissory note had been issued, it is not clear whether Cocklereece would be the purchaser of a security within the purview of the federal securities laws. *See Meason v. Bank of*

*Miami*, 652 F.2d 542 (5th Cir. 1981) (in analyzing whether certificate of deposit is a security, court should utilize commercial-investment dichotomy); *Reid v. Hughes*, 578 F.2d 634 (5th Cir. 1978) (while in certain situations a certificate of deposit can be a security, mere pledge of a certificate of deposit by one company to enable second company to purchase stock of third corporation without consideration to first company did not involve a security); *Bellah v. First National Bank of Hereford, Texas*, 495 F.2d 1109 (5th Cir. 1974) (even though certificate of deposit did not appear to be a security based on evidence presented to the district court, case should not have been dismissed for lack of subject matter jurisdiction; notes issued in context of commercial loan transaction fall beyond purview of securities laws); *Hendrickson v. Buchbinder*, 465 F.Supp. 1250 (S.D. Fla.1979) (issuance of certificate of deposit in exchange for currency creates solely a debtor-creditor relationship, and is not a security transaction). *Cf. Superintendent of Insurance of State of New York v. Banker's Life & Casualty Co.*, 300 F.Supp. 1083 (S.D.N.Y.1969) (district court expressly refrained from reaching the question whether certain certificates of deposit were securities), *aff'd*, 430 F.2d 355 (2d Cir. 1970), *rev'd on other grounds*, 404 U.S. 6,

Cocklereece was the purchaser of a security within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934,[11] the court's inquiry must necessarily focus on the loan commitment letter [12] sent to the plaintiff by James Feeney, President of Oaks-Darby Ltd.

Recognizing that the definitional sections of the securities laws do not include the phrase "loan commitment", the plaintiff argues that the Oaks-Darby Ltd. commitment falls within the statutory terms "evidence of indebtedness" or "investment contract." Defendants counter this argument by insisting that Cocklereece purchased merely an unconditional contractual right to a $2,000,000 certificate of deposit which is analogous to a home mortgage loan where advance fees are paid for a loan commitment that is expected to be consummated.

■ In deciding the securities issue, "a court must examine the economic realities of the transaction in question to determine whether it is appropriately characterized as commercial or investment in nature." *Meason*, 652 F.2d at 548. As the Fifth Circuit has observed, this approach is rooted in the language and history of the securities laws and the decisions of the Supreme Court.

*Id.* Congress intended the laws to be remedial in nature:

> The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion. . . .

*Id.* at 549 n.14.[13] Thus, Congress sought to define the term "security" in sufficiently broad terms so as to afford extensive protection to the investing public. *See Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Yet, as the Supreme Court recently noted, "'a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.'" *United Housing Foundation v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), *quoting Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

The Fifth Circuit has consistently taken a functional, case-by-case approach, restrict-

92 S.Ct. 165, 30 L.Ed.2d 128 (1971), *on remand*, 401 F.Supp. 640 (S.D.N.Y.1975).

**11.** Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1) defines a "security" as "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

As the *Meason* court noted, "the definition of a 'security' in section 3(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is 'virtually identical' . . . the latter Act omitting 'evidence of indebtedness.'" 652 F.2d at 548–49 n.13.

**12.** The letter dated July 9, 1977 described the terms at which the certificate of deposit would

be obtained but did not refer to the loan which allegedly was to be obtained in the United States by the Funding Group in Cocklereece's name. Nevertheless, since the circumstances surrounding the alleged securities transaction should also be considered in determining whether a security exists, *see SEC v. Continental Commodities Corp.*, 497 F.2d 516, 527 (5th Cir. 1974); *MacKethan v. Peat, Marwick, Mitchell & Co.*, 439 F.Supp. 1090, 1095 (E.D.Va. 1977), the court will construe the entire transaction as the purchase of a loan commitment.

**13.** The plaintiff argues that "the basic legislative intent of the Federal Securities Acts is to protect the public from the sale of fraudulent and speculative schemes and to prevent the exploitation of the public." Plaintiff's Supplementary Brief at 11. This characterization fails utterly to take into account the fact that Congress, in enacting these laws, intended to protect investors, and not victims of fraudulent commercial transactions. *See Bellah v. First National Bank of Hereford, Texas*, 495 F.2d 1109 (5th Cir. 1974).

ing the scope of "security" to those transactions which have the character of an investment, and excluding those of a commercial nature. This court will begin, therefore, by examining several Fifth Circuit cases to determine the guidelines which should be applied in the instant case.

In *Bellah v. First National Bank of Hereford, Texas,* 495 F.2d 1109 (5th Cir. 1974), the plaintiffs owned a livestock business for which they had borrowed operating funds from the bank. They executed a six-month promissory note, secured by a deed of trust covering seventeen tracts of real estate, to the bank. The Fifth Circuit found that the bank merely intended to aid the owners in the operation of their livestock business and did not seek to profit from the successful operation of the business. On this basis, the court held that the notes were commercial in nature and thus not securities. The case was dismissed for lack of subject matter jurisdiction.

Similarly, in *National Bank of Commerce v. All American Assurance Co.,* 583 F.2d 1295 (5th Cir. 1978), the bank sought to recover damages from borrowers who had allegedly pledged worthless stock in procuring a loan. The Fifth Circuit held that the note executed by the borrowers was commercial in nature, and affirmed the district court's order dismissing the case for lack of subject matter jurisdiction. There was nothing in the transaction to indicate that it was anything other than a loan evidenced by a promissory note and secured by a pledge of securities. In reaching this conclusion, the court found that there were no special investment rights given to the payee, that the note was payable in fixed amounts at fixed times, that repayment was not conditioned upon profit or productivity of the company, that no class of investors was involved, and that the bank anticipated no gain beyond repayment of the note with interest.

■ Although both of these decisions rest on the distinction between commercial and investment transactions, neither attempts a conclusive explanation of the distinction. *Williamson v. Tucker,* 645 F.2d 404, 428 (5th

Cir. 1981); *accord, McClure v. First National Bank of Lubbock, Texas,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Securities & Exchange Commission v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974); *First Federal Savings & Loan Association v. Mortgage Corp. of the South,* 467 F.Supp. 943 (N.D.Ala.1979), *aff'd,* 650 F.2d 1376 (5th Cir. 1981). The Fifth Circuit has not heretofore been presented with the precise question whether a loan commitment constitutes a security. Nevertheless, the court believes that, under the "commercial-investment" test, the instant transaction is not a security.

Plaintiff first contends that the loan commitment constituted an investment contract in that he "was promised a $2,000,000 loan through the management skills of the consortium . . . ." Plaintiff's Brief at 17. It is alleged that:

> Aside from turning over $30,000 Cocklereece was to do nothing other than receive the proceeds of the loan, a loan not otherwise obtainable . . . and, if obtainable, only at a substantially higher interest rate. The proceeds, once available, were then to be placed into for-profit ventures of Cocklereece.

Plaintiff's Supplementary Brief at 10. In fact, Cocklereece intended to use the loan to acquire the stock of McDaniel Printing Company. Phillips Dep. at 92. In response to this argument, the defendants, relying on *SEC v. W. J. Howey,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), insist that since "Cocklereece had no expectation of profits, much less 'profits' to be produced through the efforts of others," the commitment letter was not an investment contract. Defendants' Reply Brief at 24. The court finds the defendants' argument persuasive.

The federal securities statutes do not define the term "investment contract." According to the Supreme Court there must be: (1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than an inves-

tor.[14] *SEC v. W. J. Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–1103; *accord, Williamson v. Tucker*, 645 F.2d at 417. The loan commitment transaction in this case clearly does not satisfy the first and third *Howey* elements. With respect to the first element, Cocklereece apparently claims that the payment of $30,000 to Oaks-Darby Ltd. was an investment of money. However, the record establishes that Cocklereece paid the sum as an escrow deposit for the interest for the certificate of deposit and loan. Affidavit of A. Cocklereece, filed Nov. 16, 1981 at ¶ 3.

More significantly, as to the third element, Cocklereece states that the $2,000,000 loan offered two economic advantages that would produce a profit for him: (1) a loan at a lower interest rate than the prevailing rate; and, (2) a loan he could not otherwise procure. Plaintiff's Supplementary Brief at 10. In light of these facts, plaintiff asserts, citing *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974), the third prong of *Howey* should be construed flexibly to encompass an "anticipation of profit." However, the cited case is distinguishable from the case at bar. In *Continental Commodities Corp.*, a commodities option dealer issued notes to some of its customers in partial reimbursement of sums owed them upon the suspension of trading in futures options. The issue presented to the Fifth Circuit was whether the notes fell within the statutory phrase "any note" under the federal securities laws. The court held the notes were securities because they were issued "to rejuvenate and not to liquidate the enterprise." 497 F.2d at 527. Customers accepted the notes on the hope that the firm would be revived. They had a genuine stake in the survival of the firm, for they could expect a higher return on their investments in the event the firm survived than in the event it was forced into bankruptcy.

In contrast, Cocklereece had no expectation of profit from the loan commitment itself. Rather, he intended through his own efforts to use the loan for profitmaking ventures, specifically to purchase the stock of McDaniel Printing Company. He may have relied on the Funding Group to obtain the loan for which he advanced $30,000, but he did not rely on their efforts ultimately to obtain the profit he anticipated from operating the printing company. Thus, the court concludes that this is not the type of transaction contemplated by the term "investment contract" under the securities laws.

Alternatively, plaintiff contends that the loan commitment is "evidence of indebtedness." In support of this proposition, plaintiff relies heavily on two Tenth Circuit decisions, *United States v. Austin*, 462 F.2d 724, 726 (10th Cir.), *cert. denied*, 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972), and *McGovern Plaza Joint Venture v. First of Denver Mortgage Investors*, 562 F.2d 645, 648 (10th Cir. 1977). In *Austin*, a criminal case, defendants executed an advance money scheme and were convicted of securities fraud, mail fraud, and aiding and abetting. On appeal to the Tenth Circuit, the defendants challenged the trial court's jury instruction that, as a matter of law, a letter of loan commitment was a security. Construing the statutory phrase "evidence of indebtedness," the court stated that it included "all contractual obligations to pay in the future for consideration presently received."[15] While acknowledging that a letter of commitment was not an indicium of debt in the same sense as a promissory note, the court found that:

... this letter of commitment was sold for substantial consideration, and the buyer received what appeared to be an enforceable obligation which contemplated the flow of funds. It indicated a binding and legally enforceable right.

14. Although the Supreme Court used the word "solely" in the *Howey* decision, this term has been read broadly by the Fifth Circuit. *See Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981) (whether the efforts made by those other than the investor are the undeniably sig-

nificant ones, those essential managerial efforts which affect the failure or success of the enterprise).

15. 462 F.2d at 736.

462 F.2d at 736.[16]  Thus, the court held the letter to be a security.[17]

In *McGovern*, plaintiffs alleged that two companies had violated the federal securities laws in making an interim and a permanent construction loan commitment. Plaintiffs intended to use the loan to build a hotel, but neither of the loan commitments were executed.  The Tenth Circuit, in resolving the issue of whether the commitments were securities, focused on the "commercial-investment" distinction.  The Court rejected the plaintiff's argument that a promise to fund in the future, i.e. the commitment, was an investment even though the loan itself was commercial. Furthermore, the court refused to follow *Austin*, noting that there, unlike in *McGovern*, "plaintiffs were induced, by advertising and solicitation, to put up money with the expectation of profits."[18]  562 F.2d at 648.

Although the facts of this case are closer to *Austin* than *McGovern*,[19] the court declines to follow *Austin*.  In our view, the *Austin* court adopted a mode of analysis that elevated form over substance and failed to distinguish adequately between evidences of indebtedness issued and purchased in a commercial context and in an investment context.[20]  Rather, citing two state cases decided in the early 1900's, the court summarily concluded that regardless of the context in which the loan commitment was made, it was a security because it

was a contractual obligation to pay in the future for consideration presently received. 462 F.2d at 736.  Read literally, the *Austin* court's holding would transform all loan agreements into securities.  As the Fifth Circuit emphasized in *Bellah*, the federal securities laws do not create for participants in note transactions

> a boundless federal forum for vindicating their grievances.  We doubt that Congress intended by these Acts to render federal judges the guardians of all beguiled makers or payees.  Where, as here, complaints are spawned by a commercial loan transaction, recourse must be had to state not federal courts.

495 F.2d at 1114.

In the instant case, the loan commitment executed by Oaks-Darby Ltd., although literally an "evidence of indebtedness," arose in a commercial context.  Cocklereece intended to use the loan to buy the stock of McDaniel Printing Company.  He consistently referred to the commitment as a loan arrangement.  The commitment was individually negotiated and issued to Cocklereece and not to a class of investors.  The sum of $30,000 was advanced as an escrow deposit and not as a fee paid in consideration of the loan brokering services.  When these factors are taken together, it is clear that the loan commitment was commercial in nature and, therefore, not a security within the purview of the federal securities

---

**16.** In support of this proposition, the Tenth Circuit cited *Keller v. City of Scranton*, 200 Pa. 130, 49 A. 781, 782 (1901), and *Nelson v. Wilson*, 81 Mont. 560, 264 P. 679, 682 (1928).

**17.** *Accord, Whitlow & Associates, Ltd. v. Intermountain Brokers, Inc.*, 252 F.Supp. 943 (D.Haw.1966).

**18.** The court also distinguished *Austin* on the ground that: "*Austin*, a criminal case, involved a large-scale, advance-fee, loan swindle in which the defendants issued, along with false financial statements, not outright commitments, but back-up commitments guaranteeing the making of loans by others.  Plaintiffs were induced, by advertising and solicitation, to put up money with the expectation of profits.  The entire procedure was fraudulent and no loans were ever made." 562 F.2d at 648.

**19.** *Austin* is not, however, on all fours with the instant case.  In *Austin*, the victims of the fraudulent scheme apparently were required to pay a fee of $15,000.00 for the loan brokering services offered by the defendants, whereas Cocklereece paid the sum of $30,000.00 as an escrow deposit for the interest due on the certificate of deposit.

**20.** *See, e.g., Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir. 1976) (ten-month note given to bank in course of commercial financing transaction was not a security); *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975) (notes which represented borrowing of money to make partial payment on purchase of assets of a business involved ordinary commercial loan, and hence, are not securities).

laws. Thus, the defendants' motion for summary judgment as to the federal claims will be granted.

■ Plaintiff also alleges a cause of action based on the state securities laws, Ga. Code Ann. § 97–101 *et seq.*, in Counts III, V, and VI. Georgia courts adhered to the principle that "form should be disregarded for substance and that emphasis should be on economic reality when making a determination as to whether or not an instrument is a security." *Tech Resources, Inc. v. Estate of Hubbard*, 246 Ga. 583, 272 S.E.2d 314 (1980). In *Tech Resources*, the owners of all the shares of three corporations agreed to sell their shares to the plaintiff, and the plaintiff agreed to assume certain financial obligations of the corporations. Relying on the United States Supreme Court's definition of "investment contract" in *Forman*, the Georgia Supreme Court held that the stock sale did not involve a security since the buyer had not relied on anyone else for the performance of managerial duties in order to produce investment profits. In our view, the *Tech Resources* court's mode of analysis demonstrates a willingness to follow the restrictive federal approach in defining the term security. Thus, because we have found the loan commitment to be outside the purview of the federal securities laws, we reach the same conclusion as to the plaintiff's state securities claims and will grant summary judgment for the defendants.

Our decision today that the C&L defendants are entitled to summary judgment on the plaintiff's security claims necessarily includes a determination that none of the other named defendants are liable. Although these defendants have not filed summary judgment motions, to spare the parties and the court the useless time and expense in the name of an unnecessary formality, we will grant summary judgment for all the defendants on Counts III, IV, V, VI, and VII.

## IV. PLAINTIFF'S PENDENT STATE CLAIMS

■ Since the court has dismissed the plaintiff's federal claims against C&L(I) and C&L(U.S.), the question arises whether the court should exercise jurisdiction over the plaintiff's common law claims, Counts I and II, under the doctrine of pendent jurisdiction. The rule generally applied is that "[i]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed.... "*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). However, this rule is not without exception. *O'Connell v. Economic Research Analysts, Inc.*, 499 F.2d 994 (5th Cir. 1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975); Wright & Miller, 13 *Federal Practice and Procedure: Civil* § 3567 n.35. It is within the court's discretion to hear and decide the remaining state claims when the predicate for federal jurisdiction is lost. *Briggs v. American Air Filter Co.*, 455 F.Supp. 179 (N.D.Ga.1978), *aff'd*, 630 F.2d 414 (5th Cir. 1980).

■ At the time the plaintiff's complaint was filed, it presented a federal question of substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims derived from a common nucleus of operative fact—the loan transaction. Presently, even if these claims against C&L(I) and C&L(U.S.) are dismissed, the plaintiff can still litigate them in this court because diversity jurisdiction exists against other named defendants. Thus, given the already significant outlay of public and private resources for the prosecution of this case, considerations of judicial economy, convenience, and fairness to the litigants persuade the court that the plaintiff's pendent claims should be entertained. *See Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

■ Counts I and II set forth claims of fraud and breach of contract. With respect to these counts, the defendants argue in their motion for summary judgment that the plaintiff has failed to demonstrate any of the elements comprising the tort of fraud, and that in the absence of a contract,

the C&L entities are not liable for willful breach of contract. However, before we reach the factual contentions of the parties, the question of C&L(I)'s liability for its member firms' actions and C&L(U.S.)'s liability for C&L(Bahamas)'s actions must be addressed.

By order dated September 29, 1980, this court dismissed C&L(Bahamas) from the instant law suit for lack of personal jurisdiction. In that order, the court observed:

It appears from the record that C&L(Bahamas) is indeed, a "participating firm" in the international firm of Coopers & Lybrand. But there is no indication that all the "participating firms" are partners in the legal sense of sharing joint and several liability for the liabilities and torts of the other member firms, or of acting as agents for each other. The Agreement does not mention the word partnership in its terms but refers only to the "association" of the member firms. The purpose of the international firm is apparently to protect the integrity of the name "Coopers & Lybrand" and to see that the members adhere to professional and ethical standards. The Agreement, in fact, expressly states that member firms shall not be responsible for the liabilities and torts of any other member firm.

The court expressly concluded that the plaintiff failed to make a prima facie showing, under a theory of actual partnership, that C&L(Bahamas) had a relationship to the state of Georgia sufficient to permit this court to exercise personal jurisdiction over it. In our view, this holding does not necessarily resolve the issue of C&L(I)'s liability for its member firms actions or C&L(U.S.)'s liability for C&L(Bahamas)'s actions under the theory of partnership by estoppel.

In this regard, the defendants contend that C&L(I) neither produced nor reviewed the First Charter or Tamarind financial statements, and that C&L(U.S.) did not assist in the preparation of the Tamarind statement. Furthermore, defendants urge

that summary judgment should be granted because this court has previously held that the mere relationship between C&L(I) and its members firms, C&L(U.S.) and C&L(Bahamas) cannot render C&L(I) or C&L(U.S.) liable. To counter this argument, the plaintiff claims that C&L(I) or C&L(U.S.) should be held liable based on the doctrine of partnership by estoppel, that is, where a person represents himself as a partner or consents to another so representing him, he will be held liable to one who relies on that representation.

Plaintiff points to several representations in support of the theory of partnership by estoppel: the recruiting pamphlet, "Exit the Green Eyeshade," published by C&L(U.S.),[21] and the letterhead stationery upon which the First Charter and Tamarind audit opinions are written. Plaintiff alleges that his accountant, Phillips, relied on statements made in the recruiting pamphlet when he reviewed the audit opinions prepared by C&L. This pamphlet, apparently published by C&L(U.S.), states that Coopers & Lybrand is an international organization, each of whose offices is a complete accounting firm in itself. It declares that Coopers & Lybrand serves some of the world's best known corporations. And, the pamphlet touts the "Coopers & Lybrand Audit Approach" which is used by all its offices worldwide. Plaintiff's Brief, Exh. 1, at 2, 3, 4, 8. The letterhead stationery which the plaintiff's accountant viewed prior to advising Cocklereece to seek the loan, Defendants' Brief, Exh. 2, contains the words "Coopers & Lybrand, Chartered Accountants" and "In Principal Areas of the World" on the left margin and identifies the location of the firm submitting the audit opinion on the right margin. Upon a careful examination of these documents, the court finds that there is a dispute as to whether C&L(I) consented to C&L(U.S.) or C&L(Bahamas) to represent it. *See Crowe v. The Hertz Corp.* 382 F.2d 681 (5th Cir. 1967), *later app., Hertz v. Cox,* 430 F.2d 1365 (5th Cir. 1970), *later app., Harris v. Hertz Corp.,* 472 F.2d 552 (5th Cir. 1973),

**21.** Amhowitz Dep. at 174.

*cert. denied, Hertz Corp. v. Cox*, 414 U.S. 825, 94 S.Ct. 129, 38 L.Ed.2d 59 (1973). Thus, the issue of the defendants' liability under the theory of partnership by estoppel is not appropriate for summary judgment.

Finally, the court is left with the question whether summary judgment should be granted to C&L(U.S.) and C&L(I), on the plaintiff's substantive claims in Counts I and II, alleging fraud and breach of contract, respectively. Plaintiff contends primarily that C&L(U.S.) is liable on the basis on the unqualified First Charter financial statement allegedly audited by C&L(U.S.). In response, the defendant argues, first, that no false representations were made; second, that while the audit opinion was prepared by C&L(U.S.), the financial statements shown to the plaintiff's accountant upon which the plaintiff allegedly relied were forged, and thus, C&L(U.S.) is not liable; and third, that knowledge, intent, justifiable reliance, and proximate cause have not been established.

Proof of fraud under Georgia law requires (1) a false representation made by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *City Dodge, Inc. v. Gardner*, 232 Ga. 766, 208 S.E.2d 794, 797 (1974). Cocklereece claims that the First Charter financial statement constituted an intentional false representation upon which he justifiably relied to his detriment. When a motion for summary judgment has been made and properly supported under Rule 56(b), Fed.R.Civ.P., the party opposing the motion is required to submit probative evidence showing the existence of a genuine issue of material fact. *Ferguson v. National Broadcasting Co.*, 584 F.2d 111 (5th Cir. 1978). Defendant has demonstrated that the First Charter statement was a forgery, and plaintiff adduces no evidence controverting this fact. Instead, the plaintiff states that he lacks access to the information necessary to establish the genuineness of the statement. This showing is insufficient to create an issue of fact.

However, C&L(U.S.) has admitted that it prepared the unqualified audit opinion of First Charter. Affidavit of J. Silton at ¶ 4. Because the plaintiff apparently claims that the unqualified opinion was "the sine qua non for Cocklereece to consider the remainder of the First Charter financial statements," Plaintiff's Brief at 6, this admission is significant. This is particularly true when the admission is construed in light of Cocklereece's accountant's testimony which outlines the reasons why the opinion should have been qualified. Affidavit of T. Phillips at ¶ 17. Defendants vigorously deny that C&L(U.S.)'s audit opinion should have been qualified. Clearly, there is a dispute of fact as to this issue, the resolution of which is beyond the province of the court on summary adjudication. Moreover, questions of materiality, due diligence, and proximate cause are, except in plain and indisputable cases, for the jury to decide. *Brown v. Techdata Corp., Inc.*, 238 Ga. 622, 234 S.E.2d 787 (1977). The evidence in this case on these issues is far from indisputable. Therefore, summary judgment in favor of C&L(U.S.) on Count I is precluded.

With respect to C&L(I), since it is an undisputed fact that it neither prepared nor reviewed the First Charter or Tamarind financial statements nor received any part of Cocklereece's escrow deposit, it can be found liable for fraud, if at all, only on the basis of its member firms' conduct. Having concluded that C&L(U.S.) may be liable on Count I, and furthermore, that there appears to be an issue of fact as to whether the Tamarind audit opinion prepared by C&L(Bahamas) should have been qualified,[22] the court finds summary judgment for C&L(I) to be inappropriate.

---

22. Plaintiff claims that, at the time the 1976 Tamarind audit was prepared, members of the Funding Group, through Darnley Investments Ltd., held an option to purchase a majority interest in Tamarind. Allegedly, several of the officers of Darnley were members of C&L(Bahamas). Plaintiff's Brief, Exh. 2 at ¶ ¶ 11–13, Exh. 3 at ¶ ¶ 13–16. In addition, the plaintiff

In Count II, the plaintiff alleges that the defendants are liable for willful breach of the loan agreement. It is undisputed that there was no contract of any kind between Cocklereece and C&L(I) or C&L(U.S.). In light of this fact, the court is hard pressed to find a basis upon which the plaintiff can predicate a claim for willful breach of contract. Therefore, summary judgment in favor of the defendants on Count II will be granted.

Accordingly, defendants' motion for summary judgment on Counts II, III, IV, V, VI, and VII is GRANTED. Counts III, IV, V, VI, and VII are DISMISSED from this action in their entirety.[23] Defendants' motion for summary judgment on Count I is DENIED.

IT IS SO ORDERED.

contends that Lemtex(Bahamas) Ltd., whose shareholders were partners in C&L(Bahamas), provided nonaccounting services for Tamarind at the time the audit opinion was prepared. In response, the defendants assert that the Funding Group did not have any ownership rights in Tamarind, and that the plaintiff's affiants are not competent to testify about alleged irregu-

larities in the Tamarind statement. Defendants' Reply Brief at 5, 15–18.

**23.** As the court has previously indicated in Part III of this order, summary judgment will be granted to all defendants on Counts III, IV, V, VI, and VII.